In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-14-00459-CV**

_____

**HOUSTON CASUALTY COMPANY, ET AL, Appellants**

**V.**

**ANADARKO PETROLEUM CORPORATION AND ANADARKO E&P COMPANY, L.P., Appellees**

**On Appeal from the 284th District Court
Montgomery County, Texas
Trial Cause No. 12-08-08760-CV**

**MEMORANDUM OPINION**

This is an insurance coverage dispute arising from the Deepwater Horizon Oil Spill in the Gulf of Mexico. At issue in this case is the interpretation of an insurance policy establishing an indemnity obligation for defense costs resulting from the spill. Houston Casualty Company, Allianz Global Corporate & Specialty AG, Clearwater Insurance Company, Hudson Insurance Company, Lancashire Insurance Company (UK) Limited, Navigators Insurance Company, and

1

Underwriters at Lloyd's Syndicate Nos. 33, 457, 510, 609, 623, 958, 1036, 1084, 1183, 1919, 1209, 1221, 1225, 2003, 2007, 2121, 2623, 3000, 4020, 5000 (collectively "Underwriters") filed a petition for permissive appeal of the trial court's order denying their motion for summary judgment and granting Anadarko Petroleum Corporation and Anadarko E&P Company, L.P.'s (collectively "Anadarko") motion for partial summary judgment. Anadarko filed a response and cross-petition for permissive appeal. We granted the petition and the cross-petition for permissive appeal of the trial court's order. We reverse the trial court's judgment and render judgment in favor of Underwriters.

## I. Background

Many of the facts leading up to the Deepwater Horizon Oil Spill are well-known. The Macondo Well was an exploratory well located offshore in the Gulf of Mexico. The Deepwater Horizon, a mobile offshore drilling vessel owned and operated by several Transocean entities, drilled the Macondo Well. Certain British Petroleum entities (collectively "BP"), MOEX Offshore 2007 LLC ("MOEX"), and Anadarko entered into an offshore oil and gas lease with the United States for the continental shelf block in which the well was located (the "Offshore Lease"). BP, MOEX, and Anadarko entered into the Macondo Prospect Offshore Deepwater Operating Agreement (the "Operating Agreement"). BP was the designated

2

operator of the Macondo Well, while Anadarko and MOEX were non-operators. Anadarko owned a 25 percent working interest in and to the Offshore Lease.

Underwriters issued an Energy Package Policy to Anadarko covering the period from June 30, 2009, to June 30, 2010 (the "Policy"). Section III of the Policy provides excess liability insurance coverage and has a limit of liability of $150 million per "Occurrence" if Anadarko owns 100 percent of the insured operation. The Coverage provision of Section III (hereinafter "Coverage Provision") provides:

> In consideration of the payment of the premium . . . and in reliance upon the proposal for this policy . . . , statements made, and any supplementary information pertaining to the proposal which are all deemed incorporated herein, Underwriters agree, subject to the Insuring Agreements, Conditions, Exclusions, Definitions and Declarations contained in this Policy, to indemnify the "Insured" in respect of its operations anywhere in the World, for "Ultimate Net Loss" by reason of liability:
>
> > (a) imposed upon the "Insured" by law, or
> >
> > (b) assumed by the "Insured" under an "Insured Contract",
> >
> > for damages in respect of:
> >
> > (i) "Bodily Injury"
> >
> > (ii) "Personal Injury"
> >
> > (iii) "Property Damage"
> >
> > (iv) "Advertising Injury",
>
> caused by or arising out of an "Occurrence" that occurred on or after the Retroactive Date as set out in . . . the Declarations and for which a "Claim" is first made in writing against the "Insured" during the

3

Policy Period as set out in . . . the Declarations. Nothing contained in this Policy shall make this Policy subject to the terms of any other Insurance.

Section III includes an endorsement titled, "Joint Venture Provision[,]" which replaces the joint venture provision in the Insuring Agreements of Section III. The Joint Venture Provision provides:

Effective at inception and in consideration of the premium charged hereon, Insuring Agreement 4 Joint Ventures . . . is deleted and replaced with the following:

It is hereby understood and agreed by the Assured and Underwriters that as regards any liability of the Assured which is insured under this Section III and which arises in any manner whatsoever out of the operation or existence of any joint venture, co-venture, joint lease, joint operating agreement or partnership (hereinafter called 'Joint Venture') in which the Assured has an interest, the liability of Underwriters under this Section III shall be limited to the product of (a) the percentage interest of the Assured in said Joint Venture and (b) the total limit afforded the Assured under this Section III. Where the percentage interest of the Assured in said Joint Venture is not set forth in writing, the percentage to be applied shall be that which would have been imposed by law at the inception of the Joint Venture.

The Joint Venture Clause shall not apply to any liability of the Assured, when as a result of the circumstances of the Occurrence, the terms of the Joint Venture agreement place the whole of the liability of the Joint Venture on the Assured.

In the event the Assured becomes legally liable in a court of competent jurisdiction for an amount greater than their proportionate ownership interest, Underwriters hereon agree to provide coverage to the Assured to the extent the legal liability

4

increases the Assured's working interest percentage liability. If the Assured becomes legally liable for a greater percentage than their ownership interest, the liability of Underwriters shall be the combination of the Assured's working interest percentage ownership and the additional percentage(s) for which the Assured becomes legally liable.

All other terms and conditions remain unchanged.

As reflected above, the first paragraph of the Joint Venture Provision is a general scaling provision, which proportionally reduces Underwriters' limit of liability under Section III in accordance with the percentage of Anadarko's ownership interest in any given joint venture. The second and third paragraphs of the Joint Venture Provision provide two exceptions to the general scaling provision in the first paragraph.

On April 20, 2010, BP and Transocean were completing temporary abandonment operations of the Macondo Well when the well experienced a blowout and the Deepwater Horizon drilling rig exploded, burned, and sank, resulting in a discharge of oil into the Gulf of Mexico for nearly three months (the "Macondo Incident"). *See In re Oil Spill by Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, 148 F. Supp. 3d 563, 565-66 (E.D. La. 2015). A number of lawsuits were filed as a result of the Macondo Incident. *Id*. at 566. Most federal cases arising from the Macondo Incident were consolidated into Multidistrict Litigation 2179. *Id*. The United States filed suit against BP, MOEX,

Transocean, and Anadarko, seeking civil penalties under the Clean Water Act and a declaratory judgment of liability under the Oil Pollution Act of 1990 ("OPA"). *Id*. at 566-67. In February 2012, the MDL Court granted the United States' request for a declaratory judgment finding that BP and Anadarko were jointly and severally liable under the OPA for removal costs and damages related to the subsurface discharge.[1] *See* 33 U.S.C.S. § 2717(f)(2) (Lexis through Pub. L. No. 114-229) (stating that in an action for removal costs, "the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages.").

Disputes also arose between the defendants. BP submitted a claim against Anadarko for costs incurred by BP in connection with the Macondo Incident. In

---

[1] The MDL Court's finding is as follows:

> Although the words "joint and several" do not appear in OPA, OPA defines "liable" and "liability" as the standard of liability which obtains under section 1321 of this title [Section 311 of the Clean Water Act]. Liability under Section 311, in turn, has been determined repeatedly to be strict, joint and several. . . . . Therefore, as to the subsurface discharge of oil, the Court finds liability under OPA is joint and several.

(internal citations and quotations omitted). The MDL Court found BP and Anadarko to be responsible parties for the subsurface discharge of oil, as they were co-lessees of the area in which the offshore facility was located at the time of the Macondo Incident. The MDL Court then found that "[l]iability for OPA removal costs and damages is joint and several vis-à-vis BP and Anadarko and the subsurface discharge."

October 2011, Anadarko entered into a settlement agreement with BP wherein Anadarko and BP mutually agreed to release all claims against each other associated with the Macondo Incident. Anadarko agreed to pay BP $4 billion and to transfer its 25 percent interest in the Offshore Lease to BP. BP agreed to release Anadarko from all claims arising under the Operating Agreement and to indemnify Anadarko, with limited exceptions not relevant here, for all future liability, including damages or removal costs under the OPA.

On November 30, 2015, the MDL Court issued its Findings of Fact and Conclusions of Law concerning the amount of civil penalties Anadarko is required to pay under the Clean Water Act. *In re Oil Spill*, 148 F. Supp. 3d at 565. The MDL Court found Anadarko liable to the United States for civil penalties under the Clean Water Act in the amount of $159.5 million. *Id*. at 584.

The Macondo Incident implicated two sections of the Policy issued by Underwriters. Section II provided "Control of Well and Extra Expense" insurance coverage, which insured against costs associated with certain types of well blow-outs. As noted above, Section III of the Policy provided "Excess Liability" insurance coverage, which insured against claims in excess of Anadarko's underlying insurance or self-insured retention. Underwriters paid Anadarko $37.5

million under Section III of the Policy. Anadarko released Underwriters from liability under the Policy, except with regard to "Defence Expenses[.]"[2]

In August 2012, Anadarko filed suit seeking coverage from Underwriters under Section III of the Policy for defense, investigation, and adjustment costs and expenses paid by Anadarko arising out of the Macondo Incident. Underwriters moved for summary judgment, seeking dismissal of Anadarko's claims and contending essentially that it has fully paid and extinguished all liability for coverage under the Policy. Anadarko filed two motions for partial summary judgment; the second motion is at issue here. In it, Anadarko sought a ruling that Underwriters are required to reimburse the defense expenses incurred by Anadarko in connection with the Macondo Incident up to the $150 million limit of Section III, reduced only by Underwriters' prior payments to Anadarko under Section III in connection with the Macondo Incident and subject to proof of Anadarko's damages at trial. In construing the Policy, the trial court found that the relevant policy provisions are unambiguous. The trial court further found that the defense expenses are subject to scaling under the Joint Venture Provision. However, the trial court concluded that the MDL Court's judgment finding Anadarko jointly and

---

[2] Because the Policy was developed in the London market, it uses the British spelling of certain words, including "defence" and "judgement[.]" We have retained the British spelling when quoting the parties or when referencing a defined term in the Policy.

severally liable for OPA removal costs and damages triggered the exception to the Joint Venture Provision found in the third paragraph. The trial court explained that the third paragraph of the Joint Venture Provision provides that Underwriters' liability under Section III of the Policy "increases in the event that Anadarko becomes legally liable in a court of competent jurisdiction for an amount greater than its proportionate interest in a Joint Venture." The trial court concluded that under the third paragraph of the Joint Venture Provision, Underwriters' liability is equal to the combination of Anadarko's working interest percentage ownership and the additional percentage for which Anadarko becomes legally liable, up to the full limits of the Policy, without regard to any scaling of interest.

## II. Standard of Review

When both sides move for summary judgment and the trial court grants one motion and denies the other, reviewing courts consider both sides' summary judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). Therefore, we review all grounds asserted in both Anadarko and Underwriters' motions.

9

## III. Rules of Construction

Generally, an insurance policy is governed by the same rules of construction that apply to other contracts. *RSUI Indem. Co. v. Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015). In construing an insurance policy, our primary concern is to ascertain the intentions of the parties as expressed in the policy. *Id*. at 118, 127; *see also In re Deepwater Horizon*, 470 S.W.3d 452, 464 (Tex. 2015). Our analysis begins with the language of the policy because "we presume parties intend what the words of their contract say." *Gilbert*, 327 S.W.3d at 126. "We examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Id*.; *see also Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). Unless the policy states otherwise, we give words and phrases their ordinary and generally accepted meaning. *RSUI*, 466 S.W.3d at 118. We construe words and phrases in context and in light of the rules of grammar and common usage. *Id.* We will not isolate a phrase, sentence, or section of a policy and consider it apart from the other provisions. *Id*.; *Deepwater Horizon*, 470 S.W.3d at 464 ("We must examine the policy as a whole, seeking to harmonize all provisions and render none meaningless.").

Contract ambiguity is a question of law to be determined by the court. *Schaefer*, 124 S.W.3d at 157. Here, Anadarko and Underwriters present conflicting

10

interpretations of the Joint Venture Provision. However, the fact that the parties have conflicting views about the policy's meaning alone does not create an ambiguity. *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010); *Tex. Farm Bureau Mut. Ins. Co. v. Sturrock*, 146 S.W.3d 123, 126 (Tex. 2004). An ambiguity is more than a lack of clarity in the language of a policy. *RSUI*, 466 S.W.3d at 119. A policy is ambiguous only if, after applying the rules of construction, the policy remains subject to two or more reasonable interpretations. *Id.*; *see also New Castle Cty. v. Hartford Accident and Indem. Co.*, 970 F.2d 1267, 1270 (3d Cir. 1992) ("Because ambiguity lurks in every word, sentence, and paragraph in the eyes of a skilled advocate . . . the question is not whether there is an ambiguity in the metaphysical sense, but whether the language has only one reasonable meaning when construed, not in a [hyper-technical] fashion, but in an ordinary, common sense manner."). Thus, if we conclude that only one party's construction is reasonable, then the policy is unambiguous and we will adopt that party's construction. *RSUI*, 466 S.W.3d at 118 (citing *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 459 (Tex. 1997)). However, "if both [parties] present reasonable interpretations of the policy's language, we must conclude that the policy is ambiguous." *Id*. "To be ambiguous, both interpretations must be a reasonable interpretation of the words chosen by the parties when read in the

11

context of the policy as a whole." *Id.* at 130. Finally, we may not consider parol evidence to create an ambiguity. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). We may however, read the policy in light of the circumstances surrounding the policy's execution to determine whether an ambiguity exists and to settle the meaning of the policy. *Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 & n.25 (Tex. 2011). The surrounding circumstances include "'the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties.'" *Id*. at 469 (citing 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 32.7 (4th ed. 1999)).

## IV. Construing the Joint Venture Provision

Anadarko and Underwriters both contend that the plain language of the Policy and specifically, the Joint Venture Provision, is unambiguous and only supports their proposed construction.

### A. The Plain Language of the First Paragraph of the Joint Venture Provision

According to Underwriters, the Joint Venture Provision limits the liability of Underwriters, including liability as to defense expenses. By contrast, Anadarko argues that the Joint Venture Provision only scales Underwriters' liability to Anadarko under the Policy for Anadarko's liability to third parties for damages,

12

not liability for defense expenses, which Anadarko contends is more akin to a first-party liability. Anadarko contends that defense expenses are insured separately and in addition to the Policy coverage for Anadarko's "liability" for damages and the Joint Venture Provision makes no reference to its scaling provision applying to defense expenses. The trial court found that "[d]efense [e]xpenses are subject to scaling under the Joint Venture Provision." We conclude that the plain language of the Joint Venture Provision only reasonably supports the trial court's construction of the provision, which provided that defense expenses are subject to scaling.

Section III, Endorsement Number 1 of the Policy contains the Joint Venture Provision. The first paragraph of the provision provides:

> It is hereby understood and agreed by [Anadarko] and Underwriters that as regards any liability of [Anadarko] which is insured under this Section III and which arises in any manner whatsoever out of the operation or existence of any joint venture, co-venture, joint lease, joint operating agreement or partnership (hereinafter called "Joint Venture") in which [Anadarko] has an interest, the liability of Underwriters under this Section III shall be limited to the product of (a) the percentage interest of [Anadarko] in said Joint Venture and (b) the total limit afforded [Anadarko] under this Section III. Where the percentage interest of [Anadarko] in said Joint Venture is not set forth in writing, the percentage to be applied shall be that which would have been imposed by law at the inception of the Joint Venture.

The plain language of the Joint Venture Provision provides that this provision "regards any liability of [Anadarko] which is insured under this Section III[.]" Thus, the Joint Venture Provision limits its application to only those liabilities

13

covered in Section III of the Policy. Thus, to construe the Joint Venture Provision, we must first determine the scope of coverage in Section III of the Policy.

The Coverage Provision of Section III provides in relevant part that:

Underwriters agree . . . to indemnify [Anadarko] in respect of its operations anywhere in the World, for "Ultimate Net Loss" by reason of liability:

> (a)      imposed upon [Anadarko] by law, or
> (b)      assumed by [Anadarko] under an "Insured Contract",
> for damages in respect of:
> (i) "Bodily Injury"
> (ii) "Personal Injury"
> (iii) "Property Damage"
> (iv) "Advertising Injury",

caused by or arising out of an "Occurrence" . . . and for which a "Claim" is first made in writing against [Anadarko.]

The Coverage Provision does not specifically include the term "Defence Expenses"; however, "Ultimate Net Loss" is specifically included, and we must refer to the Policy's definition of "Ultimate Net Loss" to determine the meaning and scope of the Coverage Provision. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 219 (Tex. 2003) ("When terms are defined in an insurance policy, those definitions control the interpretation of the policy.").

The Policy defines "Ultimate Net Loss" as "the amount [Anadarko] is obligated to pay, by judgement or settlement, as damages resulting from an 'Occurrence' covered by this Policy, including the service of suit, institution of

14

arbitration proceedings and all 'Defence Expenses' in respect of such 'Occurrence'." The Policy defines "'Occurrence'" as "an accident, including continuous and repeated exposure to substantially the same general harmful conditions which results in 'Bodily Injury', 'Personal Injury', 'Property Damage', or 'Advertising Injury'", none of which was expected nor intended by [Anadarko]." Because the Policy defines "Ultimate Net Loss" to include the amount Anadarko is "obligated to pay" as damages from a judgment or settlement and to include service of suit, institution of arbitration proceedings, and all defense expenses with respect to the Macondo Incident, we construe "Ultimate Net Loss" to include all liabilities of Anadarko for which Underwriters agreed to indemnify in Section III.

According to Anadarko, the phrase "any liability" as used in the first paragraph of the Joint Venture Provision should not be construed broadly to include defense expenses, but should be construed as limited to only those third-party liabilities insured in Section III's Coverage Provision. The term "liability" is not a defined term in the Policy. We do not believe that the word "liability" is so restricted as to only refer to "third-party" liability. Generally, "liability" is "[t]he quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment[.]" *Liability*, BLACK'S LAW DICTIONARY (9th ed. 2009). "Liability" can also mean "[a]

15

financial or pecuniary obligation[.]" *Id*. There is nothing in the plain language of the Policy to suggest that the parties intended to limit the meaning of "liability" to only include "third-party" liability. On the contrary, the plain language supports a broad, general use of the word. The Joint Venture Provision is written to include "'any liability'" of Anadarko insured under Section III of the Policy. As discussed above, the Coverage Provision of Section III is reasonably construed as including liabilities for defense expenses. Thus, the Joint Venture Provision is reasonably construed as including defense expenses as a liability and therefore subject to scaling under the terms of the Joint Venture Provision.

Anadarko's interpretation of the Policy would render the Policy's language that "Underwriters agree . . . to indemnify [Anadarko] . . . for 'Ultimate Net Loss'" meaningless and would also force us to rewrite the language of the Policy. Underwriters contend that the plain language of the Joint Venture Provision implies breadth and inclusiveness, noting that the Joint Venture Provision expressly includes "'**any** liability . . . insured under . . . Section III and . . . [arising] in **any manner** *whatsoever* out of . . . **any** [Joint Venture]. . . .'" Anadarko's interpretation would require this Court to replace the broad language of the Joint Venture Provision in the Policy—"as regards any liability of [Anadarko]"—with far more limiting language—"as regards any third-party liability of Anadarko."

16

Underwriters contend that we should not judicially rewrite the Policy by inserting the word "third-party" into it. *See Gilbert*, 327 S.W.3d at 126-27 (declining to judicially rewrite the parties' exclusion by inserting a word into it). We agree.

Finally, we note that the General Declarations section of the Policy, which incorporates the limits for the Policy, makes no reference to defense expenses being payable on a different basis from costs awarded by way of damages for liabilities incurred under the Policy. Section III of the Policy contains a single limit of liability—"USD 150,000,000 (100%) any one occurrence without aggregate except for Products and Completed Operations (as defined by Policy Wording) which [are] subject to a USD 150,000,000 aggregate limit of liability." The Policy provision defining the "Limits of Liability" under Section III, provides as follows:

> Underwriters shall only be liable for 'Ultimate Net Loss' in excess of:
> (a) the Underlying Insurance(s) set out in . . . the Declarations[;] or,
> (b) the Self Insured Retention set out in . . . the Declarations, whichever is greater and then only up to the amount stated in Item 4(a) of the Declarations in respect of each 'Occurrence.'"

The parties knew how to provide for coverage regarding defense costs on a different basis, as they did so for "Products and Completed Operations[,]" which are expressly insured on an aggregate limit of liability.

We conclude the first paragraph of the Joint Venture Provision is only susceptible to one reasonable interpretation, that is, defense expenses are subject to scaling under the Joint Venture Provision.

**B. The First Exception of the Joint Venture Provision**

The trial court expressly made no ruling regarding the first exception of the Joint Venture Provision. The first exception to the Joint Venture Provision provides:

> The Joint Venture Clause shall not apply to any liability of [Anadarko], when as a result of the circumstances of the Occurrence, the terms of the Joint Venture agreement place the whole of the liability of the Joint Venture on [Anadarko].

"Joint Venture agreement" is not a defined term in the Policy. Anadarko contends that the reference to the "Joint Venture agreement" includes not only the Operating Agreement, but also the Offshore Lease. In support, Anadarko cites to the language in the first paragraph of the Joint Venture Provision, which states that the provision regards any liability of Anadarko that is insured under Section III and that "arises in any manner whatsoever out of the operation or existence of any joint venture, co-venture, joint lease, joint operating agreement or partnership (hereinafter called 'Joint Venture') in which [Anadarko] has an interest[.]"

18

Anadarko contends that the first exception is triggered in this case because the Offshore Lease places "the whole of the liability of the Joint Venture" on Anadarko. In the Offshore Lease, the United States and BP agreed that the Offshore Lease is "subject to . . . all other applicable statutes[.]" BP later assigned a percentage of its interest in the Offshore Lease to Anadarko. According to Anadarko, because the OPA regulates the discharge of oil into or upon the navigable waters or adjoining shorelines, it is an applicable statute and has been incorporated into the terms of the Offshore Lease. Anadarko contends that as a lessee under the Offshore Lease, it is subject to the OPA's joint and several liability and thus, is wholly liable for removal costs and damages from the wrongful discharge of oil.

Assuming without deciding that the Offshore Lease is part of the Joint Venture agreement under the Policy and that the OPA's joint and several liability provision is made applicable as a term of the Offshore Lease, we conclude that the Offshore Lease does not place "the whole of the liability of the Joint Venture" on Anadarko.

Anadarko contends that the "whole of the liability of the Joint Venture" was placed on it because the MDL Court found it jointly and severally liable for 100 percent of the OPA removal costs and damages. Underwriters respond that

19

Anadarko incorrectly limits its analysis to only OPA liability and that there were other liabilities of the Joint Venture stemming from the Macondo Incident. We conclude that Underwriters' interpretation of the exception is the only reasonable interpretation.

The Policy states that this exception is applicable "when as a result of the circumstances of the Occurrence, the terms of the Joint Venture agreement place the whole of the liability of the Joint Venture on [Anadarko]." Here, the circumstances of the Occurrence are the circumstances surrounding the Macondo Incident. The Policy does not define "whole" but we give it its ordinary meaning. "Whole" means "constituting the total sum or undiminished entirety of" something. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2611 (3d ed. 2002). "Whole" is also defined as "all there is of a thing." THE OXFORD DESK DICTIONARY AND THESAURUS 920 (American Ed. 1997). The phrase "of the liability" in the sentence is a prepositional phrase that modifies the word "whole[,]" which is used as a noun and is the direct object in the dependent clause "when . . . the terms of the Joint Venture agreement place the whole of the liability on [Anadarko]." Thus, by the plain language of the Policy, it is clear that the parties' intent was that this exception apply in a circumstance in which all of the

Joint Venture's liability stemming from an Occurrence, not just one particular type of liability, i.e., OPA liability, was placed on Anadarko.

The OPA is not the exclusive source of potential liability for the Joint Venture partners. Under the OPA, responsible parties are liable for all removal costs and damages, including injuries to natural resources, destruction of property, loss of subsistence use of natural resources, loss of tax revenue, loss of profits or earning capacity, and net increased costs for additional public services. *See* 33 U.S.C.S. § 2701(5) (LEXIS through Pub. L. No. 114-229) (defining damages); § 2702 (b)(2) (LEXIS through Pub. L. No. 114-229) (identifying types of damages covered under OPA). Notably, the OPA does not provide a cause of action for personal injuries. *See* 33 U.S.C.S. §§ 2701(5); 2702; *see also In re Oil Spill by the Oil Rig "Deepwater Horizon"*, MDL No. 2179, 2011 U.S. Dist. LEXIS 10497, at *18 (E.D. La. Feb. 2, 2011) (noting that personal injury and death claims fall outside of scope of OPA). Thus, even if Anadarko were declared wholly liable for claims asserted under the OPA, the Joint Venture potentially has numerous other non-OPA claims in which neither the Operating Agreement, nor the Offshore Lease place liability wholly on Anadarko. *See e.g. In re Deepwater Horizon Robert Young v. BP Expl. & Prod., Inc.*, 786 F.3d 344, 348 (5th Cir. 2015) (discussing non-OPA claims involving physical injury and death under general federal

21

maritime law); *In re Oil Spill by Oil Rig "Deepwater Horizon"*, 295 F.R.D. 112, 117-18, 119-120, 134-36, 161 (E.D. La. 2013) (approving class settlement of certain claims of individuals engaged as clean-up workers and residents of particular geographical boundaries in the Gulf of Mexico related to their exposure to oil or dispersants arising from the Macondo Incident and subsequent response efforts of BP); *see also In re Oil Spill by Oil Rig "Deepwater Horizon"*, 808 F. Supp. 2d 943, 962-63, 968-69 (E.D. La. 2011), *aff'd*, 745 F.3d 157 (5th Cir. 2014) (explaining that the OPA displaces general maritime law claims against Responsible Parties but only with regard to procedure, thus, if OPA presentment requirements are met, claims for punitive damages are available for general maritime law claimants against Responsible Parties); *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, MDL No. 2179, 2011 U.S. Dist. LEXIS 131069, at *29, 50 (E.D. La. Nov. 1 4, 2011), *aff'd*, 745 F.3d 157 (5th Cir. 2014) (concluding that the states may be entitled to receive punitive damages under general maritime law, but ultimately dismissing the states' general maritime law negligence claims against Anadarko and MOEX).

Anadarko bases its entire argument regarding the first exception on the Offshore Lease's incorporation of the OPA and its joint and several liability provision. As fully discussed above, even if we accept Anadarko's argument that

22

the Offshore Lease is a Joint Venture agreement under the Policy and places all OPA liability on Anadarko, the Offshore Lease does not place all of the Joint Venture's liability on Anadarko. Anadarko does not dispute that the Operating Agreement governs the relationship between BP and the non-operating Joint Venture partners. The Operating Agreement provides that each party to the agreement will bear liability in proportion to its percentage of ownership in the Macondo Well. The Operating Agreement also places all liability upon one party only if that party was grossly negligent or engaged in willful misconduct. The MDL Court found only BP grossly negligent, and dismissed all negligence claims against Anadarko. *See In re Oil Spill by the Oil Rig "Deepwater Horizon"*, 21 F. Supp. 3d 657, 757 (E.D. La. 2014); *see also In re Oil Spill*, 148 F. Supp. 3d at 567-68; *In re Oil Spill*, 808 F. Supp. 2d at 963. Because the Joint Venture Agreement did not place the whole of the liability of the Joint Venture on Anadarko, the first exception to the Joint Venture Provision is inapplicable.

## C. The Second Exception of the Joint Venture Provision

The trial court found that the MDL Court's determination that Anadarko was jointly and severally liable for the OPA removal costs and damages triggered the second exception of the Joint Venture Provision. As a result, the trial court concluded that the scaling provision of the Joint Venture Provision was not

23

applicable and that "Anadarko is entitled . . . to payment of 100 percent of its Ultimate Net Loss" under the terms of the Policy. The second exception to the Joint Venture Provision provides:

> In the event [Anadarko] becomes legally liable in a court of competent jurisdiction for an amount greater than their proportionate ownership interest, Underwriters hereon agree to provide coverage to [Anadarko] to the extent the legal liability increases [Anadarko's] working interest percentage liability. If [Anadarko] becomes legally liable for a greater percentage than their ownership interest, the liability of Underwriters shall be the combination of [Anadarko's] working interest percentage ownership and the additional percentage(s) for which [Anadarko] becomes legally liable.

Underwriters contend the trial court erred in finding this exception applicable because it is only triggered when Anadarko is first adjudicated to be liable for a fixed and certain amount that is greater than its proportionate ownership interest in the joint venture and actually pays the fixed amount. Underwriters contend that an actual judgment for a specific amount is required because a finding of potential liability does not satisfy the provision's requirement for a finding of legal liability. Second, according to Underwriters, the trial court's finding must actually increase Anadarko's working interest percentage in the joint venture.

The second exception contained in the Joint Venture Provision is made up of two complementary sentences. The first sentence establishes the basis for indemnifying Anadarko for a greater percentage than its working interest

24

percentage—i.e., when Anadarko becomes legally liable for an amount greater than 25 percent. The second sentence establishes how Underwriters' new limit of liability is to be calculated in such event, i.e.,—25 percent plus the additional percentage for which Anadarko is found legally liable.

At the heart of this dispute is the MDL Court's ruling that Anadarko was jointly and severally liable for OPA costs and damages. Underwriters contend the MDL Court's ruling amounts only to a ruling of "potential liability" because the MDL Court did not actually hold Anadarko legally liable for a specific amount of damages. Anadarko responds that the MDL Court did find it liable for a specific amount of damages, namely, 100 percent of the OPA costs and damages. And, according to Anadarko, the Joint Venture Provision does not require a finding that Anadarko pay a specific amount of damages. Anadarko contends the finding that it was jointly and severally liable is sufficient to meet the Policy's requirement that it be held legally liable for an amount greater than its percentage of ownership.

To resolve this dispute, we must look first to the MDL Court's order. Pursuant to 33 U.S.C.S. § 2717(f)(2), the MDL Court's order granted the United States' motion requesting a declaratory judgment that Anadarko and BP were jointly and severally liable for OPA removal costs and damages. *See generally* 33 U.S.C.S. § 2717(f)(2). However, we conclude the MDL court's declaratory

25

judgment did not trigger the Joint Venture Provision's second exception because a judgment holding a party jointly and severally liable for OPA costs and damages is not the same as a judgment for recovery of a particular amount for such costs. *See Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 12-13 (1st Cir. 2004) (interpreting effect of declaratory judgment issued in an action under CERCLA and finding that judgment on liability for future costs is not itself a judgment for recovery of such costs or damages). An action to declare rights is not an action for money damages. *See Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 660-61 (Tex. 2009). Thus, the MDL Court's order successfully declared Anadarko jointly and severally liable, but did not set the amount for which Anadarko was liable, which is what the second exception to the Joint Venture Provision contemplated in providing that Anadarko must become "legally liable . . . for *an amount* greater than [its] proportionate ownership interest" (emphasis added).The United States prevailed on its request for declaratory judgment and the trial court rendered judgment on liability, but the MDL Court did not rule on *the amount* of monetary damages for which Anadarko was liable.

As explained above, coverage under Section III of the Policy is for Anadarko's "Ultimate Net Loss," which is defined in part as "the amount [Anadarko] is obligated to pay, by judgement or settlement, as damages[.]" Thus,

26

for a damages claim to be covered under Section III of the Policy, the plain language of the Policy supports that the damages amount must be set forth in a judgment or settlement creating an actual obligation for Anadarko to pay. A "judgment" is a "court's final determination of the rights and obligations of the parties in a case." *Judgment*, BLACK'S LAW DICTIONARY (9th ed. 2009). There is no dispute that the MDL Court found Anadarko jointly and severally liable with BP for OPA removal costs and damages. The MDL Court determined that BP and Anadarko are both liable as responsible parties under the OPA. However, after making this finding, the MDL Court noted that though the issue of BP and Anadarko's liability was settled, "there may be issues regarding quantum in subsequent actions[.]" The MDL Court did not further expound on the meaning of this statement. "[Q]uantum" means "quantity" or "amount[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1859 (3d ed. 2002). Webster's gives the following verbal illustration of an appropriate use of the word "quantum" in context—"the [quantum] of damages to be assessed[.]" *Id*. It also defines "quantum" as "a certain or an allotted amount[.]" *Id.* Thus, the MDL Court's order could reasonably be interpreted as indicating the MDL Court anticipated further litigation on this matter to determine the actual amount of OPA removal costs and damages for which Anadarko and BP would be liable. The MDL Court did not

27

make a final determination as to the amount of Anadarko's actual legal obligation. Nothing in the record before us shows that Anadarko has been ordered to pay any specific amount of OPA expenses in a judgment. Anadarko did enter into a settlement agreement with BP wherein Anadarko paid $4 billion to BP for damages and cleanup costs arising from the Macondo Incident. There is some evidence in the record to support that Anadarko's payment to BP is an amount that is less than Anadarko's 25 percent proportionate ownership interest in the well.[3] In the settlement agreement, BP agreed to indemnify Anadarko for any OPA liability. There is no evidence in the record of other settlement agreements in which Anadarko agreed to pay additional funds for the Macondo Incident. And, in April 2016, the MDL Court entered a final judgment adopting a consent decree in which the United States agreed to not pursue Anadarko for any OPA liability. *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, MDL No. 2179, 2016 U.S. Dist. LEXIS 50466, at *83-86 (E.D. La. Apr. 4, 2016). Thus, while the MDL Court's order suggests that the MDL Court initially anticipated future litigation to determine the

---

[3] As explained above, the MDL Court found Anadarko liable for a $159.5 million fine under the Clean Water Act. *See In re Oil Spill by Oil Rig "Deepwater Horizon",* 148 F. Supp. 3d 563, 584 (E.D. La. 2015); *see also* 33 U.S.C.S. § 1321(b)(7) (LEXIS through Pub. L. No. 114-244). Without deciding whether the fine was a covered liability under the Policy, we note that even if we considered the fine, Anadarko's actual share of the costs stemming from the Macondo Incident remains well below its 25 percent working interest percentage in the joint venture.

actual amount of OPA liability for BP and Anadarko, the MDL Court ultimately never made that determination concerning Anadarko because BP accepted full responsibility for Anadarko's OPA liability. *See id.*

We are unable to reconcile Anadarko's interpretation of the third paragraph of the Joint Venture Provision with the Policy's definition of "Ultimate Net Loss[.]" Anadarko's interpretation of this part of the Joint Venture Provision would ultimately require Underwriters to indemnify Anadarko for a loss for which Anadarko has not become obligated to pay by judgment or settlement. Because Anadarko's interpretation renders a substantial part of the "Ultimate Net Loss" provision meaningless, we conclude Anadarko's construction is not reasonable and Underwriters construction is the only reasonable construction of the provision. *See Deepwater Horizon*, 470 S.W.3d at 464; *Gilbert*, 327 S.W.3d at 126.

For the reasons stated above, we conclude the trial court erred in granting Anadarko's motion for summary judgment. We reverse the trial court's judgment and render judgment granting Underwriters' motion for summary judgment.

REVERSED AND RENDERED.

_____
CHARLES KREGER
Justice

Submitted on May 7, 2015
Opinion Delivered November 17, 2016

Before McKeithen, C.J., Kreger and Horton, JJ.