# IN THE SUPREME COURT OF TEXAS

No. 16-1013

ANADARKO PETROLEUM CORPORATION AND ANADARKO E&P COMPANY, L.P.,
PETITIONERS,

v.

HOUSTON CASUALTY COMPANY, ET AL., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE NINTH DISTRICT OF TEXAS

**Argued September 17, 2018**

JUSTICE BOYD delivered the opinion of the Court.

The Deepwater Horizon drilling-rig incident has been called "the largest accidental marine oil spill in U.S. history."[1] After the initial blow-out and explosions claimed eleven lives, the waves of escaping oil "began a human, economic, and environmental disaster"[2] that "touched virtually every aspect of life on the Gulf of Mexico coast—and far beyond."[3]

---

[1] NAT'L COMM'N ON THE BP DEEPWATER HORIZON OIL SPILL & OFFSHORE DRILLING, REPORT TO THE PRESIDENT 173 (2011), https://www.gpo.gov/fdsys/pkg/GPO-OILCOMMISSION/pdf/GPO-OILCOMMISSION.pdf.

[2] *Id.* at vi.

[3] *Id.* at 197.

Predictably, the lingering ripples include legal disputes over the responsible parties' liabilities and the extent to which insurance covers their losses.

A few years ago, we addressed issues affecting insurance covering the BP entities that held the majority interest in the Deepwater Horizon operation.[4] Today's case involves insurance covering minority-interest owners, Anadarko Petroleum Corporation and Anadarko E&P Company, L.P. (collectively, Anadarko). The parties have resolved most of their disagreements and now focus solely on coverage for the legal fees and related expenses Anadarko incurred defending against liability and enforcement claims. Anadarko argues that the policy covers all of its defense expenses, up to the policy's $150 million excess-coverage limit. The policy's underwriters[5] contend that a negotiated policy provision caps the excess coverage—including coverage for defense costs—at twenty-five percent of that limit. The trial court agreed with Anadarko, but the court of appeals agreed with the Underwriters. Because we conclude that the provision does not limit the excess coverage for defense expenses, we reverse the court of appeals' judgment, render judgment granting Anadarko's motion for partial summary judgment, and remand the case to the trial court for further proceedings.

---

[4] *See In re Deepwater Horizon*, 470 S.W.3d 452 (Tex. 2015).

[5] Houston Casualty Company, Allianz Global Corporate & Specialty AG, Clearwater Insurance Company, Hudson Insurance Company, Lancashire Insurance Company (UK) Limited, Navigators Insurance Company and Underwriters at Lloyd's Syndicate Nos. 33, 457, 510, 609, 623, 958, 1036, 1084, 1183, 1919, 1209, 1221, 1225, 2003, 2007, 2121, 2623, 3000, 4020, 5000 (collectively, the Underwriters).

# I.
## Background

Pursuant to a joint-venture arrangement with BP entities and MOEX Offshore 2007 LLC, Anadarko held twenty-five percent of the ownership interest in the Macondo Well in the deep waters of the Gulf of Mexico. On April 20, 2010, during drilling operations from the Deepwater Horizon drilling rig, the well blew out. Over the ensuing months and years, numerous third parties filed claims against the BP entities, Anadarko, and MOEX, seeking damages for bodily injury, wrongful death, and property damage. Many of those claims were consolidated into a multi-district litigation (MDL) proceeding in the federal district court for the Eastern District of Louisiana. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL 2179, 2016 WL 1394949 (E.D. La. Apr. 4, 2016). The federal government also pursued civil penalties under the Clean Water Act and a declaratory judgment of liability under the Oil Pollution Act of 1990.

The MDL court granted a declaratory judgment finding BP and Anadarko jointly and severally liable under the Oil Pollution Act. BP and Anadarko then reached a settlement agreement in which Anadarko agreed to transfer its twenty-five percent ownership interest to BP and pay BP $4 billion. In exchange, BP agreed to release any claims it had against Anadarko and to indemnify Anadarko against all other liabilities arising out of the Deepwater Horizon incident. In light of that agreement, the United States agreed not to pursue claims against Anadarko, and the MDL court entered an order approving that agreement. *See id.*, at *23. BP did not agree, however, to cover Anadarko's

3

legal fees and other defense expenses, which Anadarko now contends total well over $100 million.

Before the incident, Anadarko purchased an "energy package" insurance policy through the Lloyd's London market.[6] In section III, the policy provides excess-liability coverage limited to $150 million per occurrence.[7] The Underwriters paid Anadarko $37.5 million under section III (twenty-five percent of the $150 million limit) based on Anadarko's twenty-five percent ownership in the joint venture that operated the Deepwater Horizon. Anadarko contends that the Underwriters must also pay all of Anadarko's defense expenses, up to section III's $150 million limit.

Unlike most general liability insurance policies,[8] this policy does not require the Underwriters to defend Anadarko against liability claims. But it does require the Underwriters to reimburse Anadarko for expenses it incurs providing its own defense. Specifically, section III requires the Underwriters to "indemnify" Anadarko for its "Ultimate Net Loss," which section III defines as "the amount [Anadarko] is obligated to pay, by judgement or settlement, as damages resulting from an 'Occurrence' covered by this Policy, *including* the service of suit, institution of arbitration proceedings *and all*

---

[6] *See Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 464–66 (Tex. 2011) (describing the unique Lloyd's London insurance market).

[7] The policy's primary coverage under section II is not at issue in this case.

[8] *See, e.g.*, *D.R. Horton-Texas, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743–45 (Tex. 2009) (discussing the duties to defend and indemnify under commercial general liability policies).

*'Defence Expenses'* in respect of such 'Occurrence.'" [Emphases added.][9] Because "Ultimate Net Loss" includes "Defence Expenses," the Underwriters agree that section III covers the costs Anadarko incurred defending against third-party and government claims, up to section III's coverage limit.

The Underwriters contend, however, that an endorsement to section III reduces the $150 million limit when—as here—Anadarko's liability arises out of the operations of a joint venture in which Anadarko has an ownership interest. This endorsement—entitled "Joint Venture Provision"—contains three separate clauses. The first clause imposes a coverage limit based on Anadarko's percentage ownership in a joint venture from which its liability arises:

> [A]s regards any liability of [Anadarko] which is insured under this Section III and which arises in any manner whatsoever out of the operation or existence of any joint venture . . . in which [Anadarko] has an interest, the liability of Underwriters under this Section III shall be limited to the product of (a) the percentage interest of [Anadarko] in said Joint Venture and (b) the total limit afforded [Anadarko] under this Section III.

Based on the product of Anadarko's percentage interest in the Deepwater Horizon joint venture (25%) and the total coverage limit under section III ($150 million), the Underwriters contend that section III caps their excess-coverage liability at $37.5 million, which they have already paid to Anadarko.

---

[9] Section III defines "Defence Expenses" to mean "investigation, adjustment, appraisal, defence and appeal costs and expenses and pre and post judgement interest, paid or incurred by or on behalf of the 'Insured.'"

The Joint Venture Provision's second clause provides an exception to the first clause's limit, which applies if Anadarko is contractually responsible for all of the joint venture's liability:

> The Joint Venture Clause shall not apply to any liability of [Anadarko], when as a result of the circumstances of the Occurrence, the terms of the Joint Venture agreement place the whole of the liability of the Joint Venture on [Anadarko].

The third clause provides another exception, which applies if a court holds Anadarko legally liable for an amount greater than the amount reflecting Anadarko's twenty-five percent interest:

> In the event [Anadarko] becomes legally liable in a court of competent jurisdiction for an amount greater than their proportionate ownership interest, Underwriters hereon agree to provide coverage to [Anadarko] to the extent the legal liability increases [Anadarko's] working interest percentage liability. If [Anadarko] becomes legally liable for a greater percentage than their ownership interest, the liability of Underwriters shall be the combination of [Anadarko's] working interest percentage ownership and the additional percentage(s) for which [Anadarko] becomes legally liable.

Anadarko agrees that the Joint Venture Provision reduces the amount the Underwriters must pay to cover Anadarko's joint-venture liabilities to third parties. So, for example, although Anadarko paid $4 billion to settle its third-party liabilities and section III limits excess coverage to $150 million, Anadarko agrees that the provision caps the excess coverage for the $4 billion payment at $37.5 million. Anadarko contends, however, that the Joint Venture Provision caps the excess coverage only for Anadarko's liabilities to

6

third parties, and not for its "defence expenses." So in addition to the $37.5 million already paid, the Underwriters must still pay all of Anadarko's defense costs up to the total $150 million limit.

When the parties could not resolve their dispute, Anadarko filed this suit seeking payment of its defense expenses up to $112.5 million ($150 million minus the $37.5 million already paid). The trial court denied the Underwriters' summary-judgment motion and granted Anadarko's summary-judgment motion in part. Finding the Joint Venture Provision unambiguous, the trial court concluded that the first clause applies to and limits coverage for Anadarko's defense expenses, but the third clause's exception also applies and increases the Underwriters' liability to "the combination of Anadarko's working interest percentage ownership and the additional percentage for which Anadarko becomes legally liable, . . . subject only to the limits of the policy after subtracting monies that Underwriters have already paid."

The court of appeals granted the parties' cross-petitions for permissive appeal, reversed the trial court's judgment, and rendered judgment for the Underwriters. *Hous. Cas. Co. v. Anadarko Petroleum Corp.*, 552 S.W.3d 268, 271 (Tex. App.—Beaumont 2016). The appellate court agreed with the trial court that the first clause applies to defense expenses but concluded that neither of the two exceptions applies. *Id.* at 278, 282. We granted Anadarko's petition for review and now hold that the Joint Venture Provision's first clause does not limit coverage for Anadarko's defense expenses.

7

## II.
## The First Clause

The primary issue is whether the Joint Venture Provision's first clause limits section III's excess-liability coverage only for amounts Anadarko was required to pay in response to third-party claims or also for amounts Anadarko paid as defense expenses. Because we conclude that the first clause does not limit the coverage for defense expenses, we need not address the second and third clauses' exceptions.

The first clause states that "the liability of Underwriters under this Section III shall be limited to" $37.5 million.[10] But that phrase immediately follows an introductory phrase: "*as regards any liability of [Anadarko]* which is insured under this Section III . . . ." [Emphasis added.] Focusing on this language, Anadarko contends that the first clause only limits the Underwriters' liability for Anadarko's "liability . . . insured," which does not include its defense expenses. In response, the Underwriters argue that the reference to Anadarko's "liability . . . insured" includes defense expenses. And even if the term "liability" does not include defense expenses, they argue, the first clause limits or "scales" their liability for all of Anadarko's Ultimate Net Loss, which includes defense expenses. We agree with Anadarko.

---

[10] The parties agree that $37.5 million is the product of 25% (Anadarko' percentage interest in the joint venture) and $150 million (the total limit under section III).

**A. "Liability . . . insured"**

When construing an insurance policy, "our primary concern is to ascertain the intentions of the parties as expressed in the document." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015). We look to the policy's language because it best represents what the parties actually intended. *Id.* Here, the parties focus first on the first clause's reference to "any liability" of Anadarko "which is insured" under section III and "which arises" out of Anadarko's joint venture with BP and MOEX. Anadarko argues that this clause limits section III's excess coverage to $37.5 million *only* "as regards" those liabilities. So we must first determine whether Anadarko's defense expenses constitute an insured liability arising out of the joint venture.

Because the policy does not define the term "liability,"[11] we must give the term its common, ordinary meaning, while reading the term "in context and in light of the rules of grammar and common usage." *Id.* To determine a term's common, ordinary meaning, we typically look first to dictionary definitions and then consider the term's usage in other authorities. *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017). Like the court of appeals,[12] the Underwriters note that dictionaries generally define the term "liability" broadly to include any kind of debt, obligation, or responsibility. *See Liability*, BLACK'S LAW DICTIONARY (10th ed. 2014)

---

[11] "When an insurance policy defines its terms, those definitions control." *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 381 (Tex. 2012).

[12] *See* 552 S.W.3d at 277.

9

(defining "liability" as the "quality, state, or condition of being legally obligated or accountable"); *Liability*, THE AMERICAN HERITAGE DICTIONARY (5th ed. 2014) (defining "liability" as "an obligation, responsibility or debt").[13]

The Underwriters argue that Anadarko's obligation to pay the lawyers, investigators, and others who helped with Anadarko's defense constitutes Anadarko's liability, particularly because the policy did not require the Underwriters to defend Anadarko against any claims. Noting that the clause refers to "any" insured liability arising in "any manner whatsoever" from the joint venture, the Underwriters argue that the term carries its broadest possible meaning and encompasses all of Anadarko's debts or obligations arising from the joint venture. To construe the clause as applying only to Anadarko's obligation to pay in response to third parties' claims, they assert, would impermissibly add words the policy does not include.

As the dictionaries confirm, the term "liability" can refer broadly to any debt or obligation. But we cannot simply stop at the dictionary definitions. Whether we are

---

[13] The court of appeals relied on Black's ninth edition, noting that it defines "liability" as "[t]he quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment," or "[a] financial or pecuniary obligation." *Id.* (quoting *Liability*, BLACK'S LAW DICTIONARY (9th ed. 2009)).

construing insurance policies, statutes,[14] pleadings,[15] or simply "language itself,"[16] context matters. As we have repeatedly explained, we must give an insurance policy's undefined words their common, ordinary meaning *unless* the policy itself demonstrates that the parties intended a "different" or more "technical" meaning. *In re Deepwater Horizon*, 470 S.W.3d at 464.[17] Because we must "give effect to all of the words and provisions so that none is rendered meaningless," *RSUI*, 466 S.W.3d at 118, we cannot isolate any word, phrase, sentence, or section from its setting and construe it without considering its context, *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994).

Instead, we must consider how the policy uses the term at issue and apply that usage unless the provision at issue clearly requires a contrary meaning. *See Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736 (Tex. 1990) ("Words used in one sense in one part of a contract are, as a general rule, deemed to have been used in the same sense in another part of the instrument, where there is nothing in the context to indicate otherwise."). Here,

---

[14] *See City of Houston v. Bates*, 406 S.W.3d 539, 545 n.2 (Tex. 2013) ("[A]s our statutory construction cases make clear, context matters.").

[15] *See ETC Mktg., Ltd. v. Harris Cty. Appraisal Dist.*, 528 S.W.3d 70, 75 (Tex. 2017) ("Context matters. And in the context of this motion there is no question that ETC failed to present the temporary-period ground at all, let alone specifically.").

[16] *Deal v. United States*, 508 U.S. 129, 132 (1993).

[17] *See also U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 23 (Tex. 2015) ("The interpretation of an insurance policy, like other contracts, begins with the text, and requires that undefined words be given their plain, ordinary, and generally accepted meanings absent some indication of a different intent."); *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) ("The policy's terms are given their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense.").

11

although the policy does not define the term "liability," it consistently distinguishes between Anadarko's "liabilities" and "expenses." Based on the policy's usage of the term "liability" and its distinguishing references to "expenses," we conclude that, consistent with the term's common meaning within insurance and other legal contexts, "liability" refers in this policy to an obligation imposed on Anadarko by law to pay for damages sustained by a third party who submits a written claim.

### 1. "Liability" as used in the Coverage Provision

In section III's coverage provision, the Underwriters agreed to indemnify Anadarko only for "Ultimate Net Loss" sustained

> *by reason of liability*
>     (a) imposed upon [Anadarko] by law, or
>     (b) assumed by [Anadarko] under an "Insured Contract",
> for damages in respect of:
>     (i) "Bodily Injury"
>     (ii) "Personal Injury"
>     (iii) "Property Damage"
>     (iv) "Advertising Injury",
> caused by or arising out of an "Occurrence" . . . for which a
> "Claim" is first made in writing against [Anadarko] during the
> Policy Period . . . .

Although section III defines "Ultimate Net Loss" to include (and thus covers) "defence expenses," it only covers an Ultimate Net Loss that Anadarko sustains "by reason of" *liability for damages* that is "imposed upon [Anadarko] by law"[18] for which a written

---

[18] The coverage provision describes liability for damages imposed on Anadarko by law *or* "assumed by [Anadarko] under an 'Insured Contract.'" But section III defines an "Insured Contract" to mean a written contract in which Anadarko assumes another party's "tort liability" to pay for a third party's "Bodily Injury," "Property Damage," "Personal Injury," or "Advertising Injury." The definition further defines "tort liability" to mean a liability that "would be imposed by law" in the absence of that written contract. So whether the "liability" to which the coverage provision

12

"Claim"[19] is made during the policy period. So the "liability . . . insured" to which the coverage provision refers is Anadarko's legally imposed obligation to pay for a third party's damages in response to a written claim. Such a liability triggers the Underwriters' obligation to indemnify Anadarko not only for that liability, but for all of its Ultimate Net Loss sustained "by reason of" that liability. The Ultimate Net Loss that section III insures includes defense expenses, but the legally imposed liability that triggers the Underwriters' duty to indemnify the Ultimate Net Loss does not. Instead, the liability insured and defense expenses are two separate components of the Ultimate Net Loss. As used in the coverage provision, the term liability does not include Anadarko's voluntarily assumed obligation to pay lawyers, investigators, or others for services provided to defend against the liability.

### 2. Liabilities and defense expenses as "Ultimate Net Loss"

As explained, section III defines "Ultimate Net Loss" to mean

> the amount [Anadarko] is obligated to pay, by judgement or settlement, as damages resulting from an "'Occurrence" covered by this Policy, including the service of suit, institution of arbitration proceedings and all "Defence Expenses" in respect of such "Occurrence."

---

refers is imposed on Anadarko or contractually assumed by Anadarko, it is a liability imposed on Anadarko by law to pay for a third party's damages.

[19] Section III defines "Claim" to mean "that part of each written demand received by [Anadarko] for damages, including the service of suit or institution of arbitration proceedings."

The Underwriters argue that Anadarko's "liability" includes its defense expenses because, under this definition, the amount Anadarko is obligated to pay as damages "includ[es]" all defense expenses. This construction, however, misreads the definition.

The meaning of the first phrase of this definition—"the amount [Anadarko] is obligated to pay"—is clear: "Ultimate Net Loss" is a quantifiable monetary obligation of Anadarko. The second phrase—"by judgement or settlement"—is an adjectival phrase describing the obligation to pay. So reading the first two phrases together, "Ultimate Net Loss" means the amount of money that a judgment or settlement obligates Anadarko to pay. The third phrase—"as damages resulting from an 'Occurrence' covered by this Policy"—further describes the payment obligation, so that "Ultimate Net Loss" means the amount of money that a judgment or settlement obligates Anadarko to pay as damages resulting from a covered occurrence.

The fourth phrase—"including the service of suit, institution of arbitration proceedings and all 'Defence Expenses' in respect of such 'Occurrence'"—confirms that defense expenses are part of the Ultimate Net Loss, but it also makes the definition itself less clear. Theoretically, at least, this phrase could further describe all of what precedes it: the amount a judgment or settlement obligates Anadarko to pay as damages resulting from a covered occurrence. Read that way, the fourth phrase would suggest that section III treats defense expenses as "damages," and thus (as the Underwriters argue) a liability. But the

14

definition refers only to damages that a judgment or settlement obligates Anadarko to pay. Judgments and settlements typically do not order a party to pay its own defense expenses.

Reasonably construed, the fourth phrase further describes only the first phrase— "the amount [Anadarko] is obligated to pay." Under this reading, the provision defines "Ultimate Net Loss" to mean an amount of money Anadarko is obligated to pay (1) as damages resulting from a covered occurrence as awarded in a judgment or settlement and (2) as defense expenses resulting from that covered occurrence. Thus, "Ultimate Net Loss" is comprised of two categories of obligations: damages awarded to third parties and defense expenses. Consistent with the coverage provision's language and the rest of the policy's usages of the terms, the definition of Ultimate Net Loss confirms that Anadarko's "liabilities" consist of its obligations imposed by law to pay for damages sustained by a third party who submits a written claim. Anadarko's "liabilities" do not include its defense expenses, although section III insures against both as part of the Ultimate Net Loss.

### 3.   "Liability" as used in other provisions

Other section III provisions use the term liability to refer to a legally imposed obligation to pay for a third party's damages in response to a written claim. A condition addressing "Cross Liability," for example, provides that if an "Occurrence" results in bodily injury or property damage to "one 'Insured' hereunder for which another 'Insured' is, or may be, *liable* then this Policy shall cover such 'Insured' against whom a *'Claim'* for *damages* has been made or may be made in the same manner as if separate policies had been issued to each 'Insured' hereunder." [Emphases added.] Similarly, section III defines

15

"Completed Operations Liability" to mean "*liability* for 'Bodily Injury' and/or 'Property Damage' arising out of the 'Insured's' operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the 'Bodily Injury' and/or 'Property Damage' happens after such Operations have been completed or abandoned." [Emphasis added.] And the Joint Venture Provision itself supports this meaning, referring in the third clause to amounts for which Anadarko may become "legally liable in a court of competent jurisdiction."

### 4.    "Liability" distinguished from other references

We have found no policy provision that implies, indicates, or suggests that a reference to a "liability . . . insured" includes expenses Anadarko itself incurs responding to or defending a "Claim." To the contrary, the policy repeatedly refers separately to "liability" and "expenses." The policy refers, for example, to "liabilities *or* expenses incurred as a result of a peril insured under this Policy," to "claims, liabilities, costs *and* expenses," to a "loss, damage *or* expense," and to a "loss damage liability *or* expense." [Emphases added.] By consistently referring separately to liabilities and expenses, the policy indicates that although it covers both, they are not the same.

### 5.    "Liability" as commonly used in legal and insurance contexts

We have explained that, in the insurance context, "liability insurance" generally covers "damage the insured does to others." *Members Mut. Ins. Co. v. Hermann Hosp.*, 664 S.W.2d 325, 327–28 (Tex. 1984) (holding that uninsured-motorist coverage did not protect the insured from liability for damages caused to others). We have also held that an

16

insured's defense expenses are not "damages" a third party sustains and "claims." *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 17 (Tex. 2007). Even in the broader common, ordinary sense, "damages" are "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury," *In re Xerox Corp.*, 555 S.W.3d 518, 529 (Tex. 2018) (quoting *Damages*, BLACK'S LAW DICTIONARY (10th ed. 2014)), and thus "attorney's fees are generally not damages, even if compensatory," *id.* (citing *In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 173 (Tex. 2013)). The policy at issue here consistently uses the terms liability, damages, and defense expenses consistent with these common legal meanings.

For these reasons, we conclude that the Joint Venture Provision's reference to "any liability of [Anadarko] which is insured" under section III does not refer to Anadarko's defense expenses. Although Anadarko's liabilities and defense expenses are both included in its "Ultimate Net Loss," and thus both are "insured" under section III, the policy distinguishes between the two, and the Joint Venture Provision applies only to liabilities, not to defense expenses.

## B. Scaling the limit

The Underwriters argue that, even if the term "liability" does not refer to defense expenses, the Joint Venture Provision nevertheless reduces or scales section III's coverage of those expenses. Specifically, they reason that because (1) the Joint Venture Provision reduces or scales their liability under section III, (2) their liability under section III is for

Ultimate Net Loss, and (3) Ultimate Net Loss includes defense expenses, the Joint Venture Provision reduces or scales their liability for defense expenses. Again, we disagree.

As explained, the Joint Venture Provision does in fact limit the Underwriters' liability "under this Section III" to $37.5 million. But the introductory phrase states that the limit applies only "as regards" Anadarko's liabilities that section III insures and that arise out of the joint venture. The Underwriters argue that the introductory phrase merely creates a "condition" that governs "when" the Joint Venture Provision applies: whenever Anadarko's liability is insured and arises out of a joint venture. Whenever that condition is satisfied, they argue, the next phrase describes "how" the first clause limits the Underwriters' liability under section III: it is scaled based on Anadarko's percentage interest in the joint venture. So, they assert, when the first clause applies, it reduces or scales the Underwriters' section III obligation to pay for Anadarko's Ultimate Net Loss, which includes defense expenses.

This argument misreads the Joint Venture Provision. The first clause does not say that the Underwriters' liability under section III is limited "when," "if," "in the event that," or "upon the condition that" Anadarko's liability is insured and arises out of a joint venture. Instead, it says the Underwriters' liability under section III is limited "*as regards* any liability" of Anadarko that is insured and arises out of a joint venture. As the Underwriters themselves concede, "as regards" means "concerning" or "with respect to." *See Regard*, NEW OXFORD AMERICAN DICTIONARY, (3d ed. 2010) (defining "as regards" as

18

"concerning, with respect to"); *Regard*, WEBSTER'S NEW COLLEGIATE DICTIONARY (9th ed. 1981) (defining "as regards" as "with respect to : CONCERNING").[20] By using the phrase "as regards," the first clause limits the Underwriters' liability "with respect to" or "concerning" Anadarko's "liability" that is insured and arises out of a joint venture. Because Anadarko's defense expenses are not liabilities, the clause does not limit the Underwriters' liability "as regards" those expenses.

The Underwriters argue that this construction renders the Joint Venture Provision's first clause absurd because it results in two separate liability limits under section III—one for Anadarko's defense expenses ($150 million) and one for Anadarko's third-party liabilities ($37.5 million). We disagree. Section III has only one excess-liability limit: $150 million is the maximum the Underwriters will ever have to pay to indemnify Anadarko for its Ultimate Net Loss, which includes both liabilities and defense costs. But when the Joint Venture Provision applies, the most the Underwriters must pay for Anadarko's joint-venture *liabilities* is $37.5 million.

So if, for example, Anadarko's liability arising out of the joint venture were $50 million and it incurred defense expenses of $50 million, for a total loss of $100 million, the Joint Venture Provision would limit the Underwriters' total liability under section III to $87.5 million ($37.5 million for liabilities plus $50 million for defense expenses), even

---

[20] *See also Edelstein v. Brown*, 100 S.W. 129, 129 (Tex. 1907) (noting the phrase "as to" is defined to mean "[s]o far as it concerns; as regards; as respects; in regard to; in respect to").

19

though section III's single liability limit is $150 million. The result would be the same if Anadarko's joint-venture liability were $100 million and its defense expenses were $50 million, for a total loss of $150 million. But if the liability were $50 million and the defense expenses were $100 million, the Joint Venture Provision would limit the Underwriters' total liability to $137.5 million ($37.5 million for liabilities and $100 million for defense expenses). And if, as alleged here, Anadarko's joint-venture liability were $4 billion and its defense expenses were some amount greater than $100 million,[21] the Joint Venture Provision and the section III liability limit would work together to limit the Underwriters' total liability to $37.5 million plus the amount of Anadarko's insured defense expenses, up to a combined total of $150 million. Without regard to the wisdom or desirability of that arrangement, we cannot agree that it is absurd. *See Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013) ("The absurdity safety valve is reserved for truly exceptional cases, and mere oddity does not equal absurdity.").

### III.
### Conclusion

For the reasons explained,[22] we hold that the Joint Venture Provision does not limit the Underwriters' liability for Anadarko's defense expenses insured under section III. We

---

[21] Anadarko asserts that its covered defense expenses exceed $100 million. The Underwriters dispute the amount, but the trial court has not yet resolved that dispute pending this interlocutory permissive appeal. We hold only that the Joint Venture Provision does not limit the Underwriters' liability for Anadarko's insured defense expenses and reach no conclusions as to the actual amount of those expenses, if any.

[22] Anadarko and its supporting amici alternatively urge us to construe the Joint Venture Provision in Anadarko's favor because (1) the parties agreed to delete certain policy provisions, including one that expressly reduced coverage for defense expenses whenever Anadarko paid a demand for damages that were "only covered in

reverse the court of appeals' judgment, render judgment granting Anadarko's motion for partial summary judgment, and remand the case to the trial court for further proceedings consistent with this opinion.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: January 25, 2019

part by this Policy," *see Hous. Expl. Co.*, 352 S.W.3d at 471–72, (2) we must construe insurance-policy provisions that purport to limit coverage strictly in favor of coverage, *see Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 668 (Tex. 2008), and (3) to the extent the Joint Venture Provision is ambiguous, we must resolve that ambiguity in the insured's favor, *see RSUI*, 466 S.W.3d at 119. Because we conclude that the Joint Venture Provision's plain language favors Anadarko's proposed result, we do not reach these alternative arguments.