

# NUMBER 13-21-00335-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

| | |
|---|---|
| ANADARKO PETROLEUM CORPORATION, | Appellant, |
| v. | |
| GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS, AND KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS, | Appellees. |

### On appeal from the 201st District Court of Travis County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Silva**
**Memorandum Opinion by Justice Silva**

Appellant Anadarko Petroleum Corporation (Anadarko) appeals the trial court's

denial of its petition for a refund for overpayment of state franchise taxes. By a single issue, Anadarko argues that the trial court erred by denying its refund because it was entitled to deduct certain settlement payments from its franchise tax payments as costs of goods sold. We affirm.

## I.     BACKGROUND[1]

The facts of this case are largely undisputed and stem from the *Deepwater Horizon* disaster in 2010. Anadarko, an oil and natural gas production company, partnered with British Petroleum (BP) as a non-operating leasehold interest holder in production from the Offshore Mississippi Canyon Block 252 (MC252) through a joint operating agreement (JOA). During suspended operations of an exploratory well (the Macondo well), millions of gallons of oil were released into the Gulf of Mexico, causing billions of dollars in damages. BP, the operator of the well, coordinated and funded the response, which included stopping the leak, removing spilled oil, cleaning and restoring natural resources, and paying damage claims to third parties affected by the spill.

During the cleanup, BP issued joint interest billing (JIB) invoices to Anadarko for its share of the expenses, which totaled approximately $6.1 billion. Although Anadarko disputed its liability, it ultimately settled with BP for $4 billion in cash. In exchange for the settlement payment, BP agreed to release all claims against Anadarko related to the spill and indemnify Anadarko for future compensatory damage claims by third parties. The settlement agreement specified that BP "will use the [c]ash [p]ayment to pay the claims

---

[1] This appeal was transferred from the Third Court of Appeals in Austin pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001.

of [p]ersons whose injuries and damages arise out of or relate to the *Deepwater Horizon* [i]ncident." Anadarko also sold its interest in the well to BP for $87.5 million.

In its federal income tax filing for 2011, Anadarko included the settlement payment as a deduction from income. The Internal Revenue Service (IRS) accepted the deduction under the "origin of the claim" doctrine.[2] In 2012, Anadarko submitted its Texas franchise tax report based on its 2011 federal income tax return. However, according to Anadarko, its "tax department had not completed its review of the circumstances surrounding the [s]pill [p]ayment, [so] it did not initially subtract the payment on its original Texas franchise tax report."

In 2015, Anadarko filed an amended 2012 franchise tax report, including its settlement payment as costs of goods sold (COGS), deducting it from its revenue, and seeking a refund of $8,084,838 as overpaid taxes. In 2016, Glenn Hegar, the Comptroller of Public Accounts of the State of Texas (Comptroller), reclassified the settlement payment as an indirect cost, limiting Anadarko's deduction to 4% of the payment. As such, the Comptroller issued a partial refund of $353,493.92 plus interest. In 2017, Anadarko filed an administrative petition asking the Comptroller to alter its position and permit Anadarko to deduct 100% of the settlement payment, but the Comptroller declined.

In 2018, before the scheduled hearing on Anadarko's petition, the Comptroller changed its position, asserting that the settlement payment was completely disallowed as a deduction and demanding a return of the partial refund it issued to Anadarko. The

---

[2] The "origin of the claim doctrine" is a federal tax doctrine that looks to the basis of liability for a settlement payment to determine whether it is tax deductible for federal income tax purposes. *See U.S. v. Gilmore*, 372 U.S. 39, 47 (1963).

Comptroller ultimately issued an amended decision, assessing $402,393.83 in additional franchise tax plus interest. Anadarko made the payment under protest.

Anadarko filed this suit against appellees Hegar and Ken Paxton, Attorney General of the State of Texas, seeking a refund of the franchise taxes it paid under the 2012 Texas franchise tax report. A bench trial proceeded where the following evidence was presented.[3]

## A. David Bump

David Bump testified he worked for Anadarko from 2006 to 2014. Bump was the manager of deepwater completions operations in the Gulf of Mexico when the disaster occurred. When asked about the difference between "tangible" and "intangible" drilling costs, Bump explained that "the intangible costs are all these services and—and personnel and people and rental equipment that goes into constructing a well, whereas the tangible costs are the actual materials that make up that wellbore, so like the pipe and the casing and the trees." Bump estimated that intangible drilling costs make up eighty-five to ninety percent of drilling costs.

Bump described the *Deepwater Horizon* disaster as "very, very rare," but explained that small spills "occur on a fairly frequent basis." Bump explained that for this particular well, BP owned 65% of the well, Mitsui Offshore owned 10%, and Anadarko owned 25%. The parties agreed that BP would "operate" the well and invoice the remaining partners on the well for their portion of the expenses.

---

[3] Over 13,000 pages of trial exhibits were ultimately produced and admitted. The exhibits include the lease agreement, spill response plan, joint interest billings, settlement agreement, federal tax returns and ancillary documents, federal litigation transcripts, deposition and administrative hearing transcripts, and other related documents.

According to Bump, BP was in the process of temporarily abandoning the well while they reviewed the data collected from the exploratory drilling when the blowout occurred. Bump stated that he did not have any personal involvement in the response to the disaster. Bump recounted some of the methods BP undertook, including drilling relief wells, setting containment domes, and deploying remote-operated vehicles. Some of the spilled oil was recovered and shipped for sale or disposal. After the well was plugged, BP permanently abandoned it.

Bump explained that "reclamation," as used in the oil and gas industry, is the process of returning a jobsite "back to as close as practical to how it looked prior to the operation starting." Bump described shoreline cleanup as "very material and manpower intensive," requiring "probably hundreds of field offices" to direct people and materials to the necessary locations. According to Bump, shoreline clean up did not start winding down until "probably two or three years, if not more, after the event."

In addition to claims from federal and state governments, BP received "hundreds of thousands of personal claims where people were deemed impacted . . . through loss of wages," including fishermen, steel mill workers, and other offshore drilling operations.

**B.    Mike Kriener**

Mike Kriener testified that he is a "JIB accountant" for Anadarko's offshore operations. Kriener further testified that the post-blowout billing to Anadarko was authorized by two sections of the JOA: one dealing with "[e]cological, [e]nvironmental, and [s]afety," and another dealing with well "[a]bandonment and [r]eclamation." Kriener noted that BP issued the first JIB for the Macondo well in January 2010. The trial court

5

admitted JIBs from January 2010 through September 2011, when the settlement was reached. The first JIB issued after the blowout was in April 2010. Although Anadarko paid the regular costs under the JIB, it refused to pay the amounts related to the blowout, taking the position that such amounts were attributable to BP's "willful misconduct and gross negligence," which Anadarko claimed it was not financially responsible for under the JOA.

Kriener reviewed all the JIBs and summarized them in a single document. According to Kriener, of the $6.1 billion BP billed to Anadarko, $3.38 billion was for spill removal costs[4] and $2.37 billion was for damage claims. Although Kriener was not involved in the settlement negotiations, he agreed that a representative for Anadarko testified in federal litigation related to the disaster that "the 4-billion-dollar settlement payment [was] for injuries and damages." Relatedly, when questioned by the federal court regarding the $4 billion payment being fungible, Anadarko's witness responded: "It was Anadarko's intent that the money be used for that."

## C.    Estella Alvarado

Estella Alvarado works for Occidental Petroleum (Oxy), the company that acquired Anadarko in 2019. Prior to the acquisition, Alvarado worked as a supervisor of production accounting and regulatory reporting for Anadarko's domestic and offshore operations. Alvarado explained that her job consisted of collecting daily oil and gas production and sales data to provide monthly reports to state and federal agencies.

---

[4] The spill removal costs included a subcategory titled "INCIDENT RESPONSE" which totaled $2.63 billion of the $3.38 billion. Other large subcategories include $391 million for "SHORELINE & FIELD RESPONSE" and $184 million for "COAST GUARD."

As to the Macondo well, Alvarado communicated with BP regarding production quantities. Under federal regulations and the Macondo well lease, the federal government was entitled to 18.75% royalties on the oil produced, including spilled oil. According to Alvarado, Anadarko did not consider the spilled oil "produced" because "the well was never completed." However, the federal government issued a decision "that the oil that flowed from the Macondo well was production." Accordingly, Anadarko paid the federal government approximately $11,700,00 in royalties.

Alvarado testified that of the approximately four million barrels of oil that spilled from the Macondo well, Anadarko's ownership interest represented one million. Of those one million barrels, 170,000 were sold and the remaining 830,000 were lost to waste. Because the cost of the well exceeded the amount it produced, Anadarko classified it as a dry well.

**D.   Jason Shayne Buchanan**

Jason Shayne Buchanan is the director of tax for Oxy. Although Buchanan was never employed by Anadarko, he reviewed Anadarko's tax filings for tax years 2008 through 2011. Buchanan noted that Anadarko did not list the settlement payment under "intangible drilling costs," instead listing it under "other deductions" on its federal tax return. Buchanan explained that he believed Anadarko segregated the payment so "it would be easy for the IRS to review and know where that amount was placed in the federal income tax return." Buchanan agreed that Anadarko did not intend to offer any testimony or evidence that was inconsistent with the stated use of funds in the settlement agreement. However, Buchanan testified that Anadarko "used the origin of claim

doctrine . . . in order to report that expense" as COGS in their formal refund request to the Comptroller. The majority of Buchanan's testimony related to Anadarko's federal tax return and its characterization of the settlement payment on that return.

On cross examination, Buchanan acknowledged that in a response to an IRS inquiry, Anadarko reported that "[i]t did not pay any [JIBs] related to the spill response." Additionally, when asked by the IRS whether any of the JIBs were honored, Anadarko responded, "To the extent that a post-incident invoice included [JIB] amounts for spill response and other items related to the incident, such amounts were not paid." Moreover, for the same tax year, Anadarko only reported $1,257,090.03 as intangible drilling costs and $69,161,664 as abandonment costs. However, in a separate document to the IRS, Anadarko stated that it "has agreed to pay $4 billion in cash and transfer its interest in the MC252 lease to BP . . . and BP has agreed to accept this in full satisfaction of its claims against Anadarko for [$]6.1 billion of invoices issued to date."

## E.    Judgment

The parties each submitted proposed findings of fact and conclusions of law and proposed judgments as their closing argument. The trial court issued a take-nothing judgment in favor of appellees and issued its findings of fact and conclusions of law. The trial court concluded, in pertinent part, that the settlement payment was not deductible as COGS because it was a payment for tort damages for gross negligence, not for expenses incurred under the JIBs. This appeal followed.

## II.    APPLICABLE LAW

In Texas, taxable entities doing business in the state must pay an annual franchise

8

tax. TEX. TAX CODE ANN. § 171.001(a). As relevant here, "taxable entity" is defined to include corporations. *Id.* § 171.0002(a). To determine the tax owed, the taxable entity must first calculate its taxable margin. *See id.* § 171.002. The taxable margin may be calculated several different ways. *See id.* § 171.101(a). For the purposes of this matter, the taxable margin may be calculated by subtracting an entity's COGS from its total revenue. *Id.* § 171.101(a)(1)(B)(ii)(a)(1). In calculating COGS, an entity may deduct the direct costs of acquiring or producing the goods. *See id.* § 171.1012(c), (d). "A taxable entity may also subtract certain indirect costs that are 'in relation to the taxable entity's goods.'" *Sunstate Equip. Co., LLC v. Hegar*, 601 S.W.3d 685, 692 (Tex. 2020) (quoting TEX. TAX CODE ANN. § 171.1012(d)). "In addition, certain 'indirect or administrative overhead costs . . . allocable to the acquisition or production of goods' may be subtracted." *Id.* (quoting TEX. TAX CODE ANN. § 171.1012(f)). However, the Legislature expressly prohibited certain costs related to goods from being deducted as COGS, including "the cost of renting or leasing equipment, facilities, or real property that is not used for the production of the goods" and "rehandling costs." TEX. TAX CODE ANN. § 171.1012(e)(1), (6).

"A taxable entity shall determine its [COGS], except as otherwise provided by this section, in accordance with the methods used on the federal income tax return on which the report under this chapter is based." *Id.* § 171.1012(h). However, the federal methods do "not affect the type or category of [COGS] that may be subtracted." *Id.* "[F]ederal methods [for determining COGS] are to be used only when there are gaps in the Texas statute." *Hegar v. Gulf Copper & Mfg. Corp.*, 601 S.W.3d 668, 684 (Tex. 2020). "For

9

example, . . . because the Tax Code gives no specific instruction as to what accounting method a taxable entity must use in calculating its costs under [§] 171.1012 (e.g., cash or accrual), a taxable entity must use the same accounting method it used on its federal return." *Id.* "Subsection 171.1012(h) thus does not affect the specific mandates contained in other parts of [§] 171.1012, such as the detailed requirements of subsections (c) through (f), which are the core of the COGS subtraction." *Id.* "Accordingly, whether a particular cost may be included in the COGS subtraction is not dependent on whether a taxable entity engages in some qualifying activities but rather on whether that cost independently meets the requirements of [§] 171.1012." *Id.*

### III.  STANDARD OF REVIEW

Whether an expense is deductible as COGS is a mixed question of law and fact. First, a trial court must determine what an expense is for—a question of fact—then whether that expense is included as COGS—a question of law. *See Gulf Copper & Mfg.*, 601 S.W.3d at 680–84. The trial court's findings of fact are reviewed under a sufficiency of the evidence standard while its conclusions of law are reviewed de novo. *Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020).

"Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. We credit favorable evidence if a reasonable factfinder could do so and disregard contrary evidence unless a reasonable factfinder could not." *Wichita County v. Envt'l Eng'g & Geotechnics, Inc.*, 576 S.W.3d 851, 861–62 (Tex. App.—Austin 2019, no pet.) (internal citations omitted). When reviewing a finding for factual sufficiency,

10

we examine the entire record, considering the evidence in favor of and contrary to the challenged finding. We must not merely substitute our judgment for that of the trier of fact. If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and explain how the contrary evidence greatly outweighs the evidence in support of the challenged finding.

*Id.* at 862. Erroneous findings of fact do not require reversal unless the erroneous finding is on an ultimate fact issue and immaterial findings are harmless. *Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 822 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

If our review calls on us to determine the meaning of a statute, "our purpose is to effectuate the Legislature's intent by giving effect to every word, clause, and sentence." *Sunstate Equip. Co.*, 601 S.W.3d at 689–90 (cleaned up). Thus, we start with the statute's text and the plain meaning of its words construed within the statute as a whole. *Id.* at 690. We will presume the Legislature intended to use the ordinary meaning of a word, unless otherwise provided for by statute, with each term interpreted consistently throughout the act. *Id.* "Only if the text reveals the statute is ambiguous, or applying its plain meaning would produce an absurd result, will we turn to extrinsic sources." *Id.*

## IV. ANALYSIS

Anadarko argues that the "economic reality" of its payment to BP is that it was based on the JIBs, from which its settlement payment was calculated, and thus the payment is deductible as COGS. Appellees, on the other hand, argue that applying the economic realities doctrine results in the conclusion that the settlement payment was not deductible as COGS. Because the question of whether an expense is deductible as COGS is a mixed question of law and fact, we first review the factual findings by the trial court regarding the nature of the payment made to determine whether they were

11

supported by factually and legally sufficient evidence. *See Am. Multi-Cinema*, 605 S.W.3d at 40.

As part of its argument, Anadarko challenges various findings by the trial court, including the following:

14.     Anadarko refused to pay the amounts in the [JIBs] that were a result of the blowout because Anadarko claimed that those costs were the result of [BP]'s gross negligence.[5]

. . . .

19.     Anadarko submitted its $4 billion dollar settlement payment to its excess liability insurer and received $37.5 million in insurance proceeds pursuant to the portion of the excess policy covering "Bodily Injury and Property Damage."[6]

. . . .

26.     "To the extent that a post incident invoice included [JIB] amounts for spill response and other items related to the incident, such amounts were not paid."[7]

27.     Anadarko did not pay any [JIBs] related to the Deepwater Horizon disaster spill response.

28.     Anadarko did not directly or indirectly pay response costs or clean[]up costs for the Deepwater Horizon [d]isaster.

These findings, in part, supported the trial court's ultimate conclusion that the settlement payment was not deductible as COGS because it was a payment for tort damages for gross negligence. According to Anadarko, the findings "incorrectly omit that

---

[5] The trial court's findings of fact included citations to the record to support its findings. For brevity, we have intentionally excluded those citations.

[6] Anadarko does not challenge the veracity of this finding; rather, it argues that the "finding is irrelevant" and "incorrectly implies something nefarious related to the insurance payment."

[7] This finding quotes an exhibit containing communications from Anadarko to the IRS regarding the JIBs.

Anadarko subsequently agreed to pay a negotiated portion (approximately two-thirds) of the invoiced costs under the settlement agreement." Anadarko argues that the costs incurred under the JIBs are deductible under § 171.1012(c)(7), (d)(3), and (d)(5). Those expenses are: (1) "the cost of renting or leasing equipment, facilities, or real property directly used for the production of the goods, including pollution control equipment and intangible drilling and dry hole costs," TEX. TAX CODE ANN. § 171.1012(c)(7); (2) "spoilage and abandonment, including the costs of rework labor, reclamation, and scrap," *id.* § 171.1012(d)(3); and (3) "postproduction direct costs allocable to the property, including storage and handling costs, as provided by Subsections (c)(4) and (c)(5)." *id.* § 171.1012(d)(5). We disagree.

The trial court's finding that the payment was "a cost of committing a tort" rather than for the expenses incurred under the JIBs is supported by several pieces of evidence in the record, which include: (1) the provision in the settlement agreement stating that the payment must be used "to pay the claims of Persons whose injuries and damages arise out of or relate to the *Deepwater Horizon* Incident"; (2) Anadarko's claim for reimbursement of the settlement payment under its personal injury and property damage insurance policy;[8] (3) Anadarko's response to the IRS wherein it denied paying any of the post-spill JIBs; (4) testimony in the federal litigation wherein Anadarko sought and

---

[8] Anadarko argues that "it was reasonable for [it] to submit its settlement payment as a loss under this policy because the payment covers containment and abandonment of the well, reclamation of the gulf waters and shorelines, reimbursing the shoreline states for their costs of reclamation and damages to businesses for lost profits." We do not doubt the reasonableness of Anadarko's decision to submit the claim to its insurance, but we note that Anadarko does not argue that its liability coverage would reimburse it for ordinary COGS. Moreover, in litigation over the insurance claim, the Texas Supreme Court noted that the insurance policy covered liability for "[b]odily [i]njury," "[p]ersonal [i]njury," and "[p]roperty [d]amage." *Anadarko Petroleum Corp. v. Hous. Cas. Co.*, 573 S.W.3d 187, 193–94 (Tex. 2019).

13

received a benefit arising from a finding that the settlement payment compensated the victims of the spill; and (5) testimony during the administrative proceeding.[9] *See Envt'l Eng'g & Geotechnics*, 576 S.W.3d at 862.

Anadarko challenges additional findings, including a finding that three of four Anadarko witnesses had no direct involvement in the underlying events, and a finding that Anadarko included the settlement payment in "other deductions" rather than dry hole or intangible drilling costs on its federal tax return. However, these findings do not go to an ultimate fact issue and are otherwise immaterial to the judgment. *See Yazdani-Beioky*, 550 S.W.3d at 822. Accordingly, even if these findings are unsupported by the evidence, that would not require reversal. *See id.*; TEX. R. APP. P. 44.1(a).

Having concluded that there is sufficient evidence to support the trial court's finding that the settlement payment was for tort damages, we next must determine whether it is deductible as COGS. *See Gulf Copper & Mfg.*, 601 S.W.3d at 680–84. Tort liability payments are not "direct costs of acquiring or producing" goods, as required for COGS deduction under § 171.1012(c). *See* TEX. TAX CODE ANN. § 171.1012(c). Further, tort liability payments are not included in the additional deductible "costs in relation to the taxable entity's goods" under § 171.1012(d) and Anadarko does not argue so. *See id.*

---

[9] Jerry Byrd, Anadarko's manager of joint interest accounting and joint venture audit, testified in the administrative proceeding that

> the $4 billion was used against damages and claims, that we honestly felt that the government could come back after us under the OPA [Oil Pollution Act]. The $4 billion represented the [$]6.1 billion that we had been billed. However, Anadarko felt that the majority of costs related to the spill, the cleanup, that sort of thing, had already been paid, and our biggest liability was from the [OPA] and wanted to make sure that those people were compensated for their damages.

14

§ 171.1012(d). We presume that the Legislature intentionally excluded tort liability payments as a deductible COGS. *See Sunstate Equip. Co.*, 601 S.W.3d at 689–90. Accordingly, we conclude that the settlement payment is not deductible as COGS.[10]

The possibility that a portion of the settlement payment could have been used to reclaim land damaged by the oil spill alone is not sufficient to allow the entirety of the settlement payment as COGS deduction where a portion was also used to pay for loss of income or other unrecoverable damages; rather, Anadarko was required to show that the expenditure independently met the requirements of § 171.1012. *See id.* at 687. Similarly, even if we looked strictly to the records provided by Anadarko to determine whether the payment constituted a deductible COGS, we would be unable to accomplish such where the broad categories do not specify how the money was spent. *See id.* For example, Anadarko's summary of the $6.1 billion claimed lists $1.9 billion as "[m]iscellaneous," $1.8 billion as "EXPADJUST," and $823 million as "[l]oss and [d]amages." The voluminous JIBs are similarly opaque, including categories such as "[c]atastrophe [o]verhead," "[t]ransportation,"[11] and "[l]oss & [d]amages." *See id.*

Finally, considering the economic realities of the disaster, we note that at the time of the settlement, more than $8 billion was claimed by third parties for lost wages, property damage, and other tort claims. *See Roark Amusement & Vending*, 422 S.W.3d at 637.

---

[10] Anadarko does not argue that the settlement payment constitutes an indirect or administrative overhead cost allocable to the acquisition or production of goods and we express no opinion on whether the settlement payment would qualify as such. *See* TEX. TAX CODE ANN. § 171.1012(f).

[11] Inbound transportation costs may be deductible as COGS while outbound transportation may not. *See* TEX. TAX CODE ANN. § 171.1012(c)(4) (inbound transportation), and (e)(3) (outbound transportation). It is unclear from the JIBs what or who was transported or to where.

Moreover, Anadarko received a pecuniary benefit with its settlement agreement: BP agreed to indemnify it from any future claims, an economic reality that cannot be ignored. *Id.* These facts support the finding that the entirety of the settlement payment was for tort damages, not COGS. *See* TEX. TAX CODE ANN. § 171.1012; *Roark Amusement & Vending*, 422 S.W.3d at 637; *Envt'l Eng'g & Geotechnics*, 576 S.W.3d at 862.

Anadarko argues that the language in the settlement agreement should not control here. According to Anadarko, "If parties were allowed to subjectively categorize the nature of the claims giving rise to their dispute via a post hoc comment in their settlement agreement, it would encourage fraudulent tax avoidance and render meaningless the Legislature's categories of allowed and disallowed COGS." We agree with that general proposition; however, that does not support Anadarko's attempt to deduct the settlement payment as COGS. Rather, Anadarko now seeks to engage in post hoc reclassification of its payment in order to receive a beneficial deduction, the very thing it warns us against. However, the evidence here supports the trial court's finding that the franchise tax payment did not go to the items claimed in the JIBs, but rather to tort damages, which are not identified as COGS deductions. *See* TEX. TAX CODE ANN. § 171.1012; *Sunstate Equip. Co.*, 601 S.W.3d at 687. Accordingly, we overrule Anadarko's sole issue.

## V.     CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Delivered and filed on the
19th day of October, 2023.

16