

## NUMBER 13-21-00209-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

PROGRESSIVE COUNTY
MUTUAL INSURANCE COMPANY,                                        Appellant,

v.

ANSELMO M. CALTZONSING,                                          Appellee.

### On appeal from the 377th District Court
### of Victoria County, Texas.

## OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria**
**Opinion by Justice Benavides**

This is an interlocutory appeal that stems from the trial court's denial of appellant Progressive County Mutual Insurance Company's (Progressive) motion for summary judgment against appellee Anselmo M. Caltzonsing. We granted Progressive's petition for permissive appeal to address a matter of first impression: whether Caltzonsing is

precluded from recovering under Progressive's uninsured/underinsured motorist (UIM) coverage because the owner of the tortfeasor's vehicle was issued a certificate of self-insurance. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(f); TEX. R. APP. P. 28.3. We answer "no" and affirm the trial court's judgment.

## I.     BACKGROUND

The underlying facts of this case are not in dispute. On March 9, 2018, Caltzonsing was driving a vehicle owned by his employer, Gerado Lozada, and insured through Progressive. Janet Gaitan, the tortfeasor, "failed to control her speed and struck the trailer towed by [Caltzonsing]," causing him "serious personal injury." The car Gaitan drove was leased through EAN Holdings, LLC, d/b/a Enterprise Rent-A-Car (Enterprise). Caltzonsing recovered through Gaitan's personal auto liability policy. However, the amount recovered was insufficient to cover the entirety of the damages Caltzonsing suffered.

On August 20, 2019, Caltzonsing filed suit against: (1) Progressive, his employer's insurer; (2) Gaitan; and (3) Allstate, Caltzonsing's own insurer.[1] In his original petition, Caltzonsing sought, *inter alia*, a declaratory judgment that Gaitan was liable for the accident and that he had the right to receive UIM benefits under the Progressive policy. On September 20, 2019, Progressive filed an answer asserting in part that Caltzonsing had not established that he was legally entitled to recover through the policy's UIM coverage.

On December 10, 2020, Progressive filed a combined motion for summary

---

[1] Neither Gaitan nor Allstate is a party to this permissive appeal.

2

judgment, on both traditional and no-evidence grounds. Progressive asserted that Caltzonsing could not prove he was "'legally entitled to recover' from the underinsured motorist involved in the accident" because the "underinsured motorist, [Gaitan], was operating a vehicle owned by [Enterprise], a self-insured entity."

Attached as an exhibit to Progressive's motion for summary judgment was the insurance policy setting forth the coverage afforded to Caltzonsing through his employer. The policy contained a "[UIM] coverage Endorsement" stating:

> Subject to the Limits of Liability, if you pay the premium for this coverage, we will pay for the damages, other than punitive or exemplary damages, which an insured is legally entitled to recover from the owner or operator of an uninsured auto because of bodily injury:
>
> 1. sustained by an insured;
>
> 2. caused by an insured; and
>
> 3. arising out of the ownership, maintenance, or use of an uninsured auto.

The endorsement defined "[u]ninsured auto," in part, to include an "underinsured auto," which was in turn defined as:

> [O]ne to which a liability bond or policy applies at the time of the accident, but its limit of liability either:
>
> (i) is not enough to pay the full amount the insured is legally entitled to recover as damages; or
>
> (ii) has been reduced by payment of claims to an amount which is not enough to pay the full amount the insured is legally entitled to recover as damages.

It also excluded certain categories of vehicles from being considered uninsured. Relevant to this appeal, the endorsement excluded from the definition of an uninsured vehicle any

3

vehicle that was "owned or operated by a self-insurer under any applicable vehicle law, except a self-insurer that is or becomes insolvent." Progressive also attached as an exhibit a certificate of self-insurance issued to Enterprise by the Texas Department of Public Safety (TDPS).

The trial court ultimately denied Progressive's motion for summary judgment but granted it permission to appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d). We accepted the appeal. *See* TEX. R. APP. P. 28.3.

## II.     STANDARD OF REVIEW

We review a trial court's decision to grant or deny a motion for summary judgment de novo. *See Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007); *see also Mahoney v. Slaughter*, No. 01-14-00471-CV, 2015 WL 2159476, at *2 (Tex. App.—Houston [1st Dist.] May 7, 2015, no pet.) (mem. op.). To be entitled to summary judgment, a movant must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 548 (Tex. 1985). We indulge all reasonable inferences and resolve any doubts in favor of the non-movant. *Id.* at 549.

## III.     ANALYSIS

### A.     Interpretation of Policy

When we accept a permissive appeal, we must "do what the Legislature has authorized and 'address the merits of the legal issues certified.'" *Elephant Ins., LLC v. Kenyon*, 644 S.W.3d 137, 147 (Tex. 2022) (quoting *Sabre Travel Int'l, Ltd. v. Deutsche Lufthansa AG*, 567 S.W.3d 725, 733 (Tex. 2019)). This includes "addressing all fairly

4

included subsidiary issues and ancillary issues pertinent to resolving the controlling legal issue." *Id.*

Here, the controlling question of law that was certified to us was "whether the 'Self-Insured Exception' provisions of [Caltzonsing]'s Auto Policy preclude uninsured/underinsured ("UM/UIM") policy benefits when the tortfeasor's vehicle is owned or operated by a self-insurer like Enterprise." This question necessarily depends on an interpretation of the self-insurer exclusion in Caltzonsing's policy, which is where we shall begin our analysis.

### 1.    Standard of Review

"[W]e interpret insurance policies in Texas according to the rules of contract interpretation." *Kelly-Coppedge, Inc. v. Highlands Ins.*, 980 S.W.2d 462, 464 (Tex. 1998). "[W]e must give an insurance policy's undefined words their common, ordinary meaning *unless* the policy itself demonstrates that the parties intended a 'different' or more 'technical' meaning." *Andarko Petrol. Corp. v. Hous. Cas. Co.*, 573 S.W.3d 187, 193 (Tex. 2019). "[W]e determine the meaning of an undefined term as used in an insurance policy by applying its 'ordinary and generally accepted meaning,' as construed 'in context and in light of the rules of grammar and common usage.'" *Pharr-San Alamo Indep. Sch. Dist. v. Tex. Pol. Subdivisions Property/Casualty Joint Self Ins. Fund*, 642 S.W.3d 466, 473–74 (Tex. 2022). "An interpretation that gives each word meaning is preferable to one that renders one surplusage." *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 23–24 (Tex. 2015). "To determine a term's common, ordinary meaning, we typically look first to dictionary definitions and then consider the term's usage in other authorities." *Andarko*

5

*Petrol.*, 573 S.W.3d at 192. "But just as there are words that are so clear in meaning that they may never be altered by technical definitions or custom and usage, there may be words that simply do not have a nontechnical meaning." *RPC, Inc. v. CTMI, LLC*, 606 S.W.3d 469, 487 (Tex. App.—Fort Worth 2020, pet. denied).

An intent to exclude coverage in an insurance policy must be expressed in "clear and unambiguous language." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy*, 811 S.W.2d 552, 555 (Tex. 1991). Both the presence of an ambiguity and the interpretation of an unambiguous contract are questions of law that we review de novo. *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). "To determine whether a contract is ambiguous, we look at the agreement as a whole in light of the circumstances present when the parties entered into the contract." *Edascio, L.L.C. v. NextiraOne L.L.C.*, 264 S.W.3d 786, 796 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). "If a written contract is so worded that it can be given a definite or certain legal meaning when so considered and as applied to the matter in dispute, then it is not ambiguous." *Id.* at 765. "If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous." *Kelley-Coppedge, Inc.*, 980 S.W.2d at 464 (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)). That the parties propose two different interpretations of the provision at issue does not make it ambiguous; "ambiguity exists only if both parties' interpretations are reasonable." *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743–44 (Tex. 2020).

"Contract ambiguity comes in two flavors: patent or latent." *Kleberg County*, 543 S.W.3d at 765. "A patent ambiguity is evident on the face of the contract." *Mescalero*

6

*Energy, Inc. v. Underwriters Indem. Gen. Agency*, 56 S.W.3d 313, 319 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). "A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter." *CBI Indus., Inc.*, 907 S.W.2d at 520. "[T]he language of the polic[y] must be interpreted with reference to both the facts of the claim *and* the facts within the contemplation of the parties at the signing of the polic[y]." *Id.* "If we determine that only one party's interpretation of the insurance policy is reasonable, then the policy is unambiguous and the reasonable interpretation should be adopted." *Nassar v. Liberty Mut. Fire Ins.*, 508 S.W.3d 254, 258 (Tex. 2017).

If, however, more than one interpretation is reasonable, the language in the policy is ambiguous and it must be construed in favor of the insured. *Reyes v. Tex. All Risk Gen. Agency*, 855 S.W.2d 191, 192 (Tex. App.—Corpus Christi–Edinburg 1993, no writ) (citing *Hudson Energy*, 811 S.W.2d at 555). "The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Hudson Energy*, 811 S.W.2d at 555.

### 2. Applicable Law

#### a. Texas Law

In 1951, the Legislature enacted the Texas Motor Vehicle Safety-Responsibility Act, the name of which "is generally descriptive of its purpose." *Gillaspie v. Dep't of Pub. Safety*, 259 S.W.2d 177, 179 (Tex. 1953). Pursuant to this Act, every motorist on Texas roads must demonstrate proof of "financial responsibility." TEX. TRANSP. CODE ANN.

7

§ 601.051. To further this requirement, insurers must provide certain minimum amounts of coverage in the policies they issue. *See id.* § 601.072; TEX. INS. CODE ANN. § 1952.0515.

For instance, an insurer may not issue a policy without UIM coverage unless the consumer rejects such coverage in writing. TEX. INS. CODE ANN. § 1952.101. The purpose of the UIM statute is to protect conscientious motorists from financial loss caused by the negligence of financially irresponsible motorists. *Stracener v. United Servs. Auto. Ass'n*, 777 S.W.2d 378, 382 (Tex. 1989). UIM coverage "must provide for payment to the insured of all amounts that the insured is legally entitled to recover as damages from owners or operators of underinsured motor vehicles because of bodily injury or property damage, not to exceed the limit specified in the insurance policy." TEX. INS. CODE ANN. § 1952.106. The phrase "legally entitled to recover" simply means "that the insured must be able to show fault on the part of the uninsured motorist and the extent of the resulting damages." *Franco v. Allstate Ins.*, 505 S.W.2d 789, 792 (Tex. 1974). In a dispute as to whether a vehicle is uninsured, the insurer bears the burden of proof. TEX. INS. CODE ANN. § 1952.109.

### b. Federal Law

On August 10, 2005, the United States Congress enacted the Graves Amendment which eliminated vicarious liability for rental car companies as follows:

> An owner of a motor vehicle that rents or leases the vehicle to a person (or an affiliate of the owner) shall not be liable under the law of any State or political subdivision thereof, by reason of being the owner of the vehicle (or an affiliate of the owner), for harm to persons or property that results or arises out of the use, operation, or possession of the vehicle during the period of the rental or lease, if—

> (1)    the owner (or an affiliate of the owner) is engaged in the trade or business of renting or leasing motor vehicles; and
>
> (2)    there is no negligence or criminal wrongdoing on the part of the owner (or an affiliate of the owner).

49 U.S.C. § 30106(a).

Federal preemption derives from the Supremacy Clause of the United States Constitution. *See* U.S. CONST. art. VI, cl. 2; *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S.Ct. 1461, 1480 (2018) (plurality op.). "If a state law conflicts with federal law, it is preempted and has no effect." *Great Dane Trailers, Inc v. Estate of Wells*, 52 S.W.3d 737, 743 (Tex. 2001). There are three recognized forms of federal preemption: (1) conflict, (2) express, and (3) field. *Murphy*, 138 S.Ct. at 1479. "But all of them work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.* The Graves Amendment purports to preempt state law and eliminate vicarious liability for rental car companies whose lessees commit torts. 49 U.S.C. § 30106(a); *see Cates v. Hertz Corp.*, No. 08-10686, 2009 WL 2447792, at *6 (5th Cir. Aug. 11, 2009) (per curiam) ("The Graves Amendment preempted state law in the area of vicarious liability for owners engaged in the business of renting or leasing motor vehicles, absent a showing of negligence or criminal wrongdoing on the part of the owner.").

### 3.    Analysis

The portion of the insurance policy at issue is the exclusion that covers self-insurers. This exclusion states that uninsured vehicles do not include vehicles "owned or

9

operated by a self-insurer under any applicable vehicle law, except a self-insurer that is or becomes insolvent." Self-insurer is not defined in the policy, nor is the phrase "any applicable vehicle law." But prepositional phrases are typically understood to modify the closest antecedent, unless such a construction is unreasonable. *Certain Underwriters at Lloyd's of London v. Cardtronics, Inc.*, 438 S.W.3d 770, 782 (Tex. App.—Houston [1st Dist.] 2014, no pet.). Thus, the phrase "under any applicable vehicle law" modifies the term "self-insurer," not the phrase "owned or operated." *See id.*

"The general rule is that the laws which are in existence at the time of the making of the contract are impliedly incorporated into the contract." *Savin Corp. v. Copy Distrib. Co.*, 716 S.W.2d 690, 692 (Tex. App.—Corpus Christi–Edinburg 1986, no writ). To understand the meaning of the contract, we must therefore look to "any applicable vehicle law."

Progressive urges that § 601.124(a) of the transportation code is an "applicable vehicle law" because it defines the term "self-insurer." *See* TEX. TRANSP. CODE ANN. § 601.124(a). This provision explains that one "may qualify as" a self-insurer if they are "[a] person in whose name more than 25 motor vehicles are registered," and they "obtain[] a certificate of self-insurance issued by [TDPS] as provided by this section." *Id.* But this tells us what the minimum qualifications of a self-insurer are, not necessarily what the meaning of the term is. The permissive use of the word "may" in the statute also indicates that even having a certificate of self-insurance and twenty-five vehicles registered in their name might not be sufficient for a person to become a self-insurer. *See id.*; TEX. GOV'T CODE ANN. § 311.016 ("'May' creates discretionary authority or grants permission or a

10

power."). Indeed, the Texas Supreme Court has held that "to qualify as a self-insurer a person must meet two requirements: (1) have more than twenty-five motor vehicles registered in his name, and (2) be financially responsible." *Tex. Dep't of Pub. Safety v. Banks Transp. Co.*, 427 S.W.2d 593, 594 (Tex. 1968).

The transportation code defines financial responsibility as "the ability to respond in damages for *liability* for an accident that . . . occurs after the effective date of the document evidencing the establishment of the financial responsibility; and . . . arises out of the ownership, maintenance, or use of a motor vehicle." TEX. TRANSP. CODE ANN. § 601.002(3) (emphasis added). Thus, whether an entity is considered financially responsible in Texas will necessarily depend on its potential for being held liable for an accident. *See id.*; *Banks Transp. Co.*, 427 S.W.2d at 594.

Neither party points to any other "applicable vehicle law" in Texas, and we are unable to find any. Progressive argues that the certificate of self-insurance issued by the Department of Public Safety which states that Enterprise "has been approved as a self-insurer under the Texas Motor Vehicle Safety Responsibility Act" is sufficient to prove its status as a self-insurer. But the parties did not contract around what the Department of Public Safety considers to be a self-insurer, and therefore, this extrinsic evidence does not help us determine the meaning of the term in the policy. *See CBI Indus., Inc.*, 907 S.W.2d at 521.

In our interpretation of the term "self-insurer," we cannot divorce it "from its setting and construe it without considering its context." *Andarko Petrol.*, 573 S.W.3d at 193. Here, the policy specifies that a self-insurer is not excluded from the policy's UIM coverage if

11

that entity "is or becomes insolvent."

The term "insolvent" is not defined by the policy, so we must consider its "common, ordinary meaning." *See id.* "The meaning of 'insolvency' is not definitely fixed and it is not always used in the same sense, but its definition depends rather on the business or fact situation to which the term applies." *Parkway/Lamar Partners, L.P. v. Tom Thumb Stores, Inc.*, 877 S.W.2d 848, 849 (Tex. App.—Fort Worth 1994, writ denied). Black's Law Dictionary defines the term as "having liabilities that exceed the value of assets; having stopped paying debts in the ordinary course of business or being unable to pay them as they fall due." *Insolvent*, BLACK'S LAW DICTIONARY (11th ed. 2019). Webster's Dictionary defines the term as "unable to pay debts as they fall due in the usual course of business," "having liabilities in excess of a reasonable market value of assets held," or "insufficient to pay all debts." MERRIAM-WEBSTER DICTIONARY https://www.merriam-webster.com/dictionary/insolvent (last visited Sept. 23, 2022).

The commonality amongst these definitions is that they hinge on the inability of an entity to pay the judgments that may be obtained against it. *See Insolvent*, BLACK'S LAW DICTIONARY (11th ed. 2019); MERRIAM-WEBSTER DICTIONARY https://www.merriam-webster.com/dictionary/insolvent (last visited Sept. 23, 2022). By extending UIM coverage to cars owned or operated by insolvent self-insurers, the clause necessarily contemplates that a self-insurer must be able to pay any judgment the insured may obtain against it. Otherwise, the self-insurer will be considered uninsured or underinsured, and the self-insurer exclusion will not apply. Which, we note, conforms to the purpose of UIM coverage—to protect an insured from a financially irresponsible tortfeasor. *See Stracener*,

12

777 S.W.2d at 382.

Having analyzed its surroundings, we now turn to the meaning of "self-insurer." "The term 'self-insurance' is somewhat ambiguous." 1A COUCH ON INSURANCE § 10:1; *see Hertz Corp. v. Robineau*, 6 S.W.3d 332, 336 (Tex. App.—Austin 1999, no pet.) ("The term 'self-insurance' is a misnomer . . . ."). This is because "a self-insurer does not provide *insurance* at all." *Robineau*, 6 S.W.3d at 336. TDPS can issue a certificate of self-insurance to an entity if it "is satisfied that the person has and will continue to have the ability to pay judgments obtained against the person." TEX. TRANSP. CODE ANN. § 601.124(b)(2). But a certificate of self-insurance is not itself insurance. Rather, the certificate merely shows that the entity holding it is so financially reliable that it can satisfy any judgment against it, and it need not shoulder the expense of purchasing liability insurance for each vehicle in its fleet. *See id.*; *Robineau*, 6 S.W.3d at 336.

In insurance parlance, "the essence of self-insurance, a term of colloquial currency rather than of precise legal meaning, is the retention of the risk of loss by the one upon whom it is directly imposed by law or contract." 1A COUCH ON INSURANCE § 10:1. In other words, where an insurer shifts the risk of loss from the insured to itself, a self-insurer retains the risk. *Id.*

Thus, we conclude that a reasonable meaning of the term "self-insurer," as used within the policy at issue, requires a lack of actual insurance, financial responsibility, and some form of risk retention. Even if Progressive's interpretation is also reasonable, when an insurance policy term is susceptible to two or more reasonable interpretations, we must construe it in favor of the insured. *See Progressive Cnty. Mut. Ins. v. Sink*, 107

13

S.W.3d 547, 551 (Tex. 2003).

Because the phrase "any applicable vehicle law" is so broad, the policy may be referring to statutory law, common law, state law, or federal law. Thus, the Graves Amendment may also be an "applicable vehicle law," as the vehicle in question was owned by a rental car company. *See* 49 U.S.C. § 30106. And here, at the intersection between the meaning of the word "self-insurer" and the Graves Amendment, is where we find the dilemma in this case. Enterprise may have a certificate of self-insurance, but the risk has shifted away from it by law. *See id.* The parties do not contend that Enterprise was in any way negligent or committed a crime.[2] Therefore, pursuant to the Graves Amendment, Enterprise cannot be held liable for Gaitan's tort. *See id.* Because of this, we conclude that Enterprise is not a "self-insurer" under the terms of the policy.

Other jurisdictions have reached similar conclusions. "When construing an insurance policy, we are mindful of other courts' interpretations of policy language that is identical or very similar to the policy language at issue." *RSUI Indem. Co.*, 466 S.W.3d 113, 118 (Tex. 2015). Uniformity amongst jurisdictions is important, especially where insurance provisions are identical throughout the country. *Id.*

In *Bethke v. Auto-Owners Insurance Co.*, the policy at issue excluded from the definition of "underinsured automobile" an automobile "owned or operated by a self-insurer under any automobile law." 825 N.W.2d 482, 485–86 (Wis. 2013). Wisconsin has a statute virtually indistinguishable from our § 601.124, but also concluded that the term "self-insurer" "is not defined in Wisconsin's statutes." *Id.* at 488; *compare* TEX. TRANSP.

---

[2] Progressive acknowledges in its brief that Gaitan was the tortfeasor in this case. However, we do not express an opinion as to the ultimate issue of liability.

CODE ANN. § 601.124, *with* WIS. STAT. § 344.16.

The rental car company in *Bethke*, Avis, had obtained a certificate of self-insurance from the Wisconsin Department of Transportation. 825 N.W.2d 482 at 486. "The certificate state[d] that Avis 'ha[d] qualified as a self-insurer under the Wisconsin 'Motor Vehicle Safety Responsibility Act' chapter 344 Wisconsin Statutes.'" *Id.* The insurance company argued "that because Avis self-insured the rental vehicle, there was no coverage under the policy." *Id.* The Wisconsin Supreme Court analyzed the policy language to determine the "common and ordinary meaning" of "self-insurer" according to "what [a] reasonable person in the position of the insured would have understood the words to mean." *Id.* at 488. The court concluded that "the policy term 'self-insurer' is ambiguous because it is unclear whether a reasonable insured would understand a car rental company . . . is a 'self-insurer' under the policy," and interpreted the policy in favor of the insured. *Id.* at 493.

In *Murray*, the Eighth Circuit, applying Missouri law, examined a policy that excluded from the definition of an underinsured vehicle a vehicle "[o]wned or operated by a self-insurer as considered by any financial responsibility law, motor carrier law, or similar law." *Murray v. Am. Fam. Mut. Ins.*, 429 F.3d 757, 761 (8th Cir. 2005). The appellants argued the policy was ambiguous because the tortfeasor's vehicle "fits both the description of a vehicle that is underinsured and the description of a vehicle that is not underinsured." *Id.* at 764. The court ultimately held that "interpreting the contract to nullify coverage in this situation would be an unreasonable interpretation." *Id.* at 765.

In *Martin v. Powers*, the Tennessee Supreme Court analyzed the following policy

15

exclusion: "Uninsured motor vehicle does not mean a vehicle . . . owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer which is or becomes insolvent." 505 S.W.3d 512, 518 (Tenn. 2016) (cleaned up). In that case, an individual drove a "[r]ental [c]ar into the [p]laintiff's knee." *Id.* at 515. The plaintiff brought a claim against his insurance provider to recover for his damages. *Id.* The insurer moved for summary judgment, arguing that the rental car company that owned the tortfeasor's car was self-insured, and based on the policy language above, the plaintiff was barred from recovering as a matter of law. *Id.* at 516. As support for its motion for summary judgment, the insurance company provided a copy of the rental car company's certificate of self-insurance which "certifie[d] the company named herein ha[d] established self-insurance with the Tennessee Department of Safety for all owned or leased vehicles." *Id.*; *see* TENN. CODE ANN. § 55-12-111 (detailing the process by which an entity in Tennessee "may qualify as a self-insurer by obtaining a certificate of self-insurance").

The Tennessee Supreme Court concluded that "a reasonable person insured under an insurance policy containing the language at issue in this case would conclude that the term 'self-insurer' is a person or entity able to cover the risk of a liability through their own assets." *See id.* at 519. The court "emphasize[d] . . . that the very concept of insurance, regardless of whether the insurance exists by way of owner assets or by way of an insurance policy, is inextricably tied to the *risks of liability* that are insured against." *Id.* at 520. After determining that the policy language was ambiguous, the Tennessee Supreme Court concluded that "the [r]ental [c]ar was not owned 'by a self-insurer under any applicable motor vehicle law' and, therefore, meets the definition of an uninsured

16

motor vehicle under the [p]olicy." *Id.* at 525.

Although it is not dispositive to our analysis of the issue, our conclusion that Enterprise is not a self-insurer as contemplated by the parties' agreement is consistent with the holdings of other jurisdictions.

## B.    Violation of Public Policy[3]

Further, even if we concluded that the unambiguous meaning of the term "self-insurer" in the policy was, as Progressive suggests, an entity that was approved as a self-insurer by the TDPS, the provision would be void as it violates public policy.

### 1.    Standard of Review

"As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex. 2004) (orig. proceeding). "The Legislature determines public policy

---

[3] In its reply brief, Progressive argued that this Court was barred from considering Caltzonsing's public policy argument, as it believed he failed to raise it below. A non-movant must expressly present to the trial court the reasons why the motion should not be granted. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). "We determine whether grounds are expressly presented by looking at the written response itself." *Garrod Invs., Inc. v. Schlegel*, 139 S.W.3d 759, 765 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.). Caltzonsing argued in his summary judgment response that Progressive's interpretation of the policy was "based on absurd misreading of the UIM contract and violated Texas law," that Progressive's "bizarre interpretation makes no sense, because the purpose of UIM insurance is to protect responsible drivers from damages incurred as a result of drivers without sufficient insurance or self-insurance," and that "[t]o the extent that [Progressive's] definitions are inconsistent with the statutory definitions, the statutory definitions control."

Although Caltzonsing never used the magic words "public policy," we conclude the issue was sufficiently raised in his response to Progressive's motion for summary judgment. *See Salas v. Fluor Daniel Servs. Corp.*, 616 S.W.3d 137, 148 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (construing summary judgment response liberally); *Richmond v. L.D. Brinkman & Co. (Tex.) Inc.*, 36 S.W.3d 903, 905 n.2 (Tex. App.—Dallas 2020, pet. denied) (same); *cf. Perry v. Cohen*, 272 S.W.3d 585, 588 (Tex. 2008) (noting that "disposing of appeals for harmless procedural defects is disfavored" and that "appellate courts should reach the merits of an appeal whenever possible"); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 343 (Tex. 1993) ("Any confusion regarding what issues are expressly presented by the non-movant can . . . be resolved by exception.").

Additionally, during argument before this Court, Progressive conceded that we could consider Caltzonsing's public policy argument. We therefore will address the merits of this issue.

through the statutes it passes." *Fairfield Ins. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 665 (Tex. 2008).

"Whether a contract violates public policy is a question of law, which we review de novo." *Van Voris v. Team Chop Shop, LLC*, 402 S.W.3d 915, 922 (Tex. App.—Dallas 2013, no pet.) (citing *Barber v. Colo. I.S.D.*, 901 S.W.2d 447, 450 (Tex. 1995)). To determine whether a contract is unenforceable on public policy grounds, we must weigh "the interest in enforcing agreements versus the public policy interest against such enforcement." *Fairfield*, 246 S.W.3d at 663. "On one side of the scale is Texas' general policy favoring freedom of contract." *Id.* In weighing this interest, we "should consider the reasonable expectations of the parties and the value of certainty in enforcement of contracts generally." *Id.*

"On the other side of the scale is the extent to which the agreement frustrates important public policy." *Fairfield*, 246 S.W.3d at 663–64. We consider whether the contract is "injurious to the public good, not whether its application in a particular case results in actual injury." *Jankowiak v. Allstate Prop. & Cas. Ins.*, 201 S.W.3d 200, 210 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

### 2. Analysis

Texas has a "strong public policy in favor of preserving the freedom of contract." *Fairfield*, 246 S.W.3d at 664 (citing TEX. CONST. art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made.")). But the freedom to contract is not limitless. *Id.* "Where a valid contract prescribes particular remedies or imposes particular obligations, equity generally must

18

yield unless the contract violates positive law or offends public policy." *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 648–49 (Tex. 2007).

The "strong underlying public policy" behind the UIM statute is to protect conscientious motorists from financial loss caused by negligent financially irresponsible motorists. *Stracener*, 777 S.W.2d at 382. "U[I]M coverage, therefore, is designed to place the injured claimant in a position as though a financially irresponsible motorist had been insured." *Jankowiak*, 201 S.W.3d at 210. We construe the statute liberally to give effect to this public policy. *Old Am. Cnty. Mut. Fire Ins. v. Sanchez*, 149 S.W.3d 111, 115 (Tex. 2004); *Stracener*, 777 S.W.2d at 382; *McDonald v. S. Cnty. Mut. Ins.*, 176 S.W.3d 464, 476 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

The Texas Board of Insurance may "define 'uninsured motor vehicle,' to exclude certain motor vehicles whose operators are in fact uninsured." TEX. INS. CODE ANN. § 1952.102(b). However,

> [t]he Board must act consistently with and in furtherance of the purposes of the Act when it prescribes forms containing exclusions from the definition of 'uninsured automobile.' The validity of the exclusion here at issue, then, depends on what the purposes of the Act are and whether the Board, in promulgating the exclusion, acted consistently with and in furtherance of those purposes.

*Francis v. Int'l Serv. Ins.*, 546 S.W.2d 57, 60 (Tex. 1976). "Any provision approved by the Board of Insurance that conflicts with the uninsured motorist statute will be held ineffective." *Kemp v. Fidelity Cas. Co. of N.Y.*, 512 S.W.2d 688, 690 (Tex. 1974).

Progressive relies on two cases to urge that its exclusion does not violate Texas public policy. *See McQuinnie v. Am. Home Assur. Co.*, No. 10-10042, 2010 WL 3937387, at *4 (5th Cir. Oct. 7, 2010) (per curiam); *Nat. Gen. Ins. v. Parnham*, 357 S.E.2d 139 (Ga.

19

Ct. App. 1987). In *National General Insurance Co. v. Parnham*, a Georgia court of appeals applied Texas law to the facts of the case. 357 S.E.2d at 140. A Texas resident, Parnham, "was injured when his right knee was pinned between the Safari taxi and another taxi at the Atlanta International Airport." *Id.* The Safari taxi was self-insured, and Parnham's insurance policy included UIM coverage. *Id.* However, there existed a self-insurer exclusion in Parnham's policy that was similar to the one at issue in this case. *Id.* The Georgia court of appeals held that the self-insurer exclusion did not contravene Texas public policy because a "self-insurer does not become financially irresponsible just because it chooses the state-permitted option not to insure above the minimum." *Id.* at 141. However, we note that in *Parnham*, the insured had the ability to recover from the self-insured entity. *See id.* at 140. Because of the Graves Amendment, the same is not true here. *See* 49 U.S.C. § 30106.

In *McQuinnie*, the insured sustained damages caused by the driver of a rental car. 2010 WL 3937387, at *1. The parties did not dispute that the tortfeasor's vehicle was owned by a self-insured entity. *Id.* at *2. The Fifth Circuit concluded the policy language did not violate Texas public policy, holding that Texas law prioritizes "the insured nature of the motor vehicle rather than the tortfeasor." *Id.* at *4. We disagree with the Fifth Circuit's *Erie* guess, and as an unpublished federal decision, we are not obligated to follow it. *See Westchester Fire Ins. v. Admiral Ins.*, 152 S.W.3d 172, 183 (Tex. App.—Fort Worth 2004, pet. denied).

Litigation concerning UIM coverage is guided by tort law. *Brainard v. Trinity Universal Ins.*, 216 S.W.3d 809, 818 (Tex. 2006). Consistent with this principle is the

20

requirement that recovery under UIM coverage depends on the liability of another party. *See id.* The Texas Supreme Court has stated numerous times that an insured's ability to recover through his UIM coverage depends on the liability and insurance of the tortfeasor, not the insurance status of the vehicle. *See In re USAA Gen. Indem. Co.*, 624 S.W.3d 782, 788 (Tex. 2021) (orig. proceeding) ("If the liable motorist's insurance coverage is insufficient to compensate the insured for those damages, the contractual duty to pay UIM benefits arises."); *Allstate Ins. v. Irwin*, 627 S.W.3d 263, 265 (Tex. 2021) ("[UIM] coverage is insurance designed to fill the gap between the insured's damages from an accident and the other driver's ability to pay."); *In re USAA Gen. Indem. Co.*, 629 S.W.3d 878, 884 (Tex. 2021) (orig. proceeding) ("'Legally entitled to recover,' a term of art in the UIM context, 'means the UIM insurer is under no contractual duty to pay benefits until the insured obtains a judgment establishing the liability and underinsured status of the other motorist.'"); *In re State Farm Mut. Auto. Ins.*, 629 S.W.3d 866, 875 (Tex. 2021) (orig. proceeding) ("Thus, in order to establish State Farm's liability to them under their UIM policies—as they must to recover on their Insurance Code claims—[the insured parties] must first obtain determinations of the third-party drivers' liability and the amount of damages."); *Brainard*, 216 S.W.3d at 818 ("Consequently, the insurer's contractual obligation to pay benefits does not arise until liability and damages are determined."); *Sink*, 107 S.W.3d at 554 ("We also note that the purpose of [UIM] coverage is to cover just these kinds of situations in which a third party is legally entitled to recover from the person responsible for the accident but is unable to do so." (footnote omitted)); *Stracener*, 777 S.W.2d at 382 ("The Legislature had as its initial objective the protection of

21

conscientious motorists from 'financial loss caused by negligent financially irresponsible motorists.'").

Our sister courts have held similarly, focusing on the purpose of the UIM statute, which is to protect insured motorists who opted for UIM coverage from financially irresponsible tortfeasors. *See Loncar v. Progressive Cnty. Mut. Ins.*, 553 S.W.3d 586, 590 (Tex. App.—Dallas 2018, no pet.) ("[UIM] coverage exists here if the facts supported the [insured's] legal ability to overcome official immunity in a claim against [the tortfeasor]. That is, . . . [UIM] coverage exists if the insured has a legally enforceable right to recover judgment from the uninsured motor vehicle's owner *or* operator." (emphasis added)); *Farmers Tex. Cnty. Mut. Ins. v. Okelberry*, 424 S.W.3d 786, 790 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) ("A negligent party is underinsured whenever the available proceeds of his liability insurance are insufficient to compensate for the injured party's actual damages."); *Farmers Tex. Cnty. Mut. Ins. v. Griffin*, 868 S.W.2d 861, 868 (Tex. App.—Dallas 1993, no writ) (holding that the purpose of UIM coverage is to protect an insured from "negligent, financially irresponsible drivers in other automobiles").

The cases that have upheld exclusions in Texas have also been guided by the principle that UIM coverage is ultimately designed to protect a responsible driver from financially irresponsible tortfeasors. For instance, in *Francis v. International Service Insurance Co.*, the supreme court held that a sovereign immunity exclusion did not frustrate the purpose of the UIM statute because the governmental actor was not considered "financially irresponsible." 546 S.W.2d 57, 61 (Tex. 1976) (plurality op.) ("If the plaintiff could not recover for her injuries from the City of Grand Prairie, it would not

22

be because the City was 'financially irresponsible' in not insuring the fire truck. The reason would be because the . . . doctrine of sovereign immunity protected the city in the performance of the governmental function of providing fire protection.").

Similarly, a family member exclusion for UIM coverage has been held to not violate the purposes of the UIM statute. *See Griffin*, 868 S.W.2d at 868. This is because, typically, the family member would also be considered an insured through the applicable policy, and thus, not financially irresponsible. *See Charida v. Allstate Indem. Co.*, 259 S.W.3d 870, 876 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (discussing family member exclusion to UIM coverage and holding that "[i]n a suit between insureds on the same policy, the need to protect UIM coverage from becoming liability insurance remains"); *see also Anderson v. Tex. Farm Bureau Mut. Ins.*, No. 11-13-00004-CV, 2014 WL 3698313, at *3 (Tex. App.—Eastland July 24, 2014, no pet.) (mem. op.) ("The main purpose of UM/UIM motorist coverage is to protect the insured, his family members, and guests from the 'negligence of others,' meaning strangers to the policyholder, and not to protect against the negligence of the insured's own family members. A second rationale is that UM/UIM motorist coverage is not meant to protect others from the insured; therefore, allowing an occupant to recover under both the liability and the UM/UIM portion of the same policy on the family car would effectively convert the UM/UIM coverage into a second layer of liability coverage.") (internal citations omitted).

We turn to the exclusion at issue. Progressive argues that the self-insurer exclusion applies regardless of Enterprise's liability, and further contends that this does not violate public policy. To determine whether the policy violates the exclusion, we must

ask ourselves—Did the Board, "in promulgating the exclusion, act[] consistently with and in furtherance of" the Texas Motor Vehicle Safety-Responsibility Act? *See Francis*, 546 S.W.2d at 60. Simply put, no.

Applying the exclusion the way Progressive prays we do would be injurious to the public good. *See Jankowiak*, 201 S.W.3d at 210. Under federal law, it is not possible to recover damages from a rental car company for the torts of its lessees unless the company is also directly liable. *See* 49 U.S.C. § 30106(a). Under Progressive's interpretation of the policy, a conscientious Texan who obtains UIM coverage would be thwarted from recovering if the at-fault driver in an accident was an uninsured or underinsured motorist in a rental car. To deny UIM coverage, not because of a tortfeasor's immunity, but because of an innocent third party's immunity, is antithetical to the purpose of the UIM statute. *See Stracener*, 777 S.W.2d at 382.

The self-insurer exclusion is also easily differentiated from the sovereign immunity and the family member exclusions. The doctrines of sovereign and official immunity protect both the driver and owner of the car. *See Cameron County v. Castillo*, 7 S.W.3d 706, 709 (Tex. App.—Corpus Christi–Edinburg 1999, no pet.). Thus, the tortfeasor is immune, not the vehicle. Further, the government is not required to comply with Texas's statutory scheme concerning financial responsibility. *See* TEX. TRANSP. CODE ANN. § 601.007. The Legislature has not afforded the same protections to rental car companies. Additionally, the family member exclusion involves two insureds on the same policy—thus, neither is uninsured. *See Charida*, 259 S.W.3d at 876.

This case is most similar to *Fontanez v. Texas Farm Bureau Insurance Cos.*, 840

24

S.W.2d 647 (Tex. App.—Tyler 1992, no writ). In *Fontanez*, an uninsured thief stole an insured person's vehicle and killed the insured person with it. *Id.* at 649. A representative of the decedent's estate brought a suit to recover benefits after the insurance company denied benefits. *See id.* The decedent's policy included UIM coverage, but the insurance company argued that the insured person's car, by definition, was not an uninsured vehicle. *Id.* The Tyler court reasoned that "[i]t is unlikely that [the decedent] realized her [UIM] coverage would not apply when an uninsured thief operating her car without permission struck and killed her." *Id.* Thus, the Tyler court held that "to deny the Appellant recovery under [the insured's] policy would frustrate the purpose behind and defeat the intent of the Uninsured Motorist Act as well as conflict with the Supreme Court's reasoning in *Stracener.*" *Id.* at 650.

Similarly, it is unreasonable here to assume that Caltzonsing's employer believed that by purchasing UIM coverage, it would not be covered any time the lessee of a rental car was at-fault. *See id.* at 649. To the contrary, this is one of the exact scenarios a lay person would likely presume to be covered when paying for UIM coverage—an accident with a rental car where the driver declined supplemental coverage. Were we to enforce the contract provision as interpreted by Progressive, it would be virtually impossible for an innocent party to recover the full extent of their damages if the operator of a rental car was uninsured or underinsured.

We decline to hold that, as a matter of law, vehicles owned by self-insured entities will never be excluded from UIM coverage. Rather, such a determination is properly made on a case-by-case basis. *See id.* at 650; *Briones v. State Farm Mut. Auto Ins.*, 790 S.W.2d

25

70, 74 (Tex. App.—San Antonio 1990, writ denied).

We simply hold that the self-insurer exclusion in this case does not foreclose Caltzonsing's ability to recover because the exclusion as interpreted by Progressive frustrates the purpose of Texas' UIM statute in light of the Graves Amendment. *See Stracener*, 777 S.W.2d at 382; *cf. Young v. Progressive Se. Ins.*, 753 So.2d 80, 87 (Fla. 2000) ("[A] self-insured motorist exclusion is contrary to the statutory scheme set forth in the uninsured motorist statute, and . . . the provision in the Progressive uninsured motorist policy refusing to treat a self-insured motorist as either an underinsured or uninsured motorist is void."); *Tannone v. Amica Mut. Ins.*, 189 A.3d 99, 110 (Conn. 2018) ("Taking into account the Graves Amendment, the uninsured and underinsured motorist statutes, related state regulations, and underlying public policy, we therefore conclude that rental car companies may not be deemed self-insurers as to the negligence of their lessees.").

## IV.    CONCLUSION

Because Progressive did not establish it was entitled to judgment as a matter of law, the trial court did not err in denying its motion for summary judgment. *See Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Delivered and filed on the
17th day of November, 2022.

26